768 A.2d 688

Mariellen LOWRY

v.

STATE of Maryland.

No. 36, Sept. Term, 2000.

Court of Appeals of Maryland.

March 12, 2001.

358

Gill Cochran, Annapolis, for petitioner.

Celia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY,* RAKER, WILNER, CATHELL and HARRELL, JJ.

PER CURIAM.

On September 3, 1998, petitioner, Mariellen Lowry, was pulled over by Officer Douglass F. Catherman, of the Howard County Police Department, and charged generally with "driving while intoxicated" and related charges.[1] At the police station, after the traffic stop, petitioner consented to a breath test for alcohol concentration and made several attempts, all but one of which were unsuccessful, to provide samples which could be analyzed by to the Howard County Police.[2] In a bench trial before the District Court of Maryland, sitting in Howard County, petitioner was convicted of the lesser charge of "driving under the influence of alcohol" and the remaining traffic offenses.

Petitioner appealed to the Circuit Court for Howard County. Petitioner argued, in a motion to that court, that once she consented to the administration of a test for alcohol concentration and the breath test did not provide a percentage reading,

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Specifically, petitioner was charged with failure to obey a proper traffic control device, failure to display a registration card on demand, and with a general violation of Maryland Code (1977, 1999 Repl.Vol., 2000 Cum.Supp.), section 21–902 of the Transportation Article, which includes driving while intoxicated and the lesser included offense of driving under the influence of alcohol. We note that petitioner was arrested and charged in 1998. For clarity and uniformity, we cite the current statutes throughout this opinion. There have been no relevant substantive changes to the statutes discussed, *infra*, since 1998.

2. Howard County Police utilized an Intoximeter 3000 to perform the test. Protocol for administering the test requires that two samples be taken per test. The second sample of petitioner's first test registered as "insufficient breath." Petitioner's next two attempts both registered "interfering substance." At this point the Intoximeter Operator, Sergeant John Mitchell, ceased all further testing of petitioner for alcohol concentration.

the State had a mandatory duty, upon her request, to administer a blood test to determine alcohol concentration, and the State's failure to administer the blood test warranted, at the very least, a missing evidence instruction to the jury. The Circuit Court denied the request for the instruction, but did allow defense counsel to argue during closing arguments that because the State failed to produce a test result in evidence, an inference could be made that if the test had produced results, those results would have been favorable to petitioner. The jury convicted her of "driving under the influence of alcohol" and failure to display a registration card on demand.[3] Petitioner presented two questions in her Petition for Certiorari[4]:

I. Does Maryland's implied consent statute, Transportation Article [section] 16–205.1, impose a mandatory duty upon officers to obtain a test for alcohol concentration when a detained person consents to the taking of a test?

II. If the court finds a duty exists, what is the appropriate remedy when an officer fails to obtain an evidentiary test for alcohol concentration?

■ We shall answer the second question, assuming that a duty exists, and hold that the appropriate remedy, in that event, would be the remedy afforded by the trial court in this case—permitting petitioner to argue appropriate inferences to the jury. It is, therefore, not necessary to address the first question. The appropriate remedy, under the circumstances here present, would be to allow defense counsel to argue an inference that had a blood test been subsequently adminis-

---

3. Petitioner was sentenced to sixty days confinement with the entire sixty days suspended, two-years of unsupervised probation, a fine of $350.00 for the DUI, and a fine of $30.00 for the failure to display the registration card.

4. In her brief to this Court, petitioner attempts to have us address numerous other issues. A writ of certiorari was granted to address only the two questions outlined above. Moreover, at oral argument petitioner, upon a specific inquiry by the Court, limited her argument to the two questions stated above. The additional questions in her brief that petitioner attempts to have us answer are not properly before us.

tered, its results would have been favorable to petitioner. Defense counsel was afforded the opportunity, during closing argument, to argue an inference that had a blood test been administered, its results would have been favorable to petitioner. That is all to which she was entitled.

## I. Facts

Petitioner testified[5] that between 7:00 and 8:30 p.m. on September 3, 1998, she attended a wine and cheese reception in the office building in which she works. She further testified that at this reception she drank two glasses of Chardonnay. At approximately 8:30 p.m., she left the reception and went upstairs to her office in order to prepare for a contract presentation she was planning to give the following morning. She worked in her office until approximately 10:15 p.m. and was in her car driving home by 10:25 p.m. She testified that she was very tired from a long day at work and even tried to stop for a cup of coffee but the store was closed. At some point while driving home, she was utilizing her cellular telephone to talk with her husband. The phone disconnected and she was attempting to redial her husband's telephone number when she looked into her rearview mirror and saw a police car with its flashing lights behind her. She initially thought that the officer was trying to pass her, but then realized that he wanted her to stop. She pulled over to the side of the road, put her car in park, and turned on her emergency flashers.

Officer Catherman testified that at approximately 11:15 p.m. while on the ramp from Route 108 to eastbound Route 32, he observed Ms. Lowry's motor vehicle "swerve, crooked to the right, crossing the right side lane marker, the painted lane marker by a half a vehicle width. The vehicle then quickly swerved back into the center of the lane." Officer Catherman then initiated his emergency lighting equipment and siren on

---

5. The parties to this case testified at two proceedings: one at the District Court and one at the Circuit Court. Any testimony referred to herein is contained in the transcripts of the Circuit Court proceeding unless otherwise noted.

his police vehicle. The two vehicles traveled at approximately 50 miles per hour for another 0.2 miles before petitioner pulled over to the side of the road, put the car in park and turned on her four-way flashers.

Officer Catherman testified that when he approached the vehicle, the driver's window was rolled down and he "detected a strong fruity odor of an alcoholic beverage emitting from the car, from the driver's window. [He] observed her eyes were bloodshot and watery." When he asked petitioner for her driver's license and registration, petitioner provided him with her license, however, she could not locate the vehicle's registration. He "then asked her about the smell of the alcoholic beverage in her vehicle," to which she replied "that she had not been drinking, she was just very tired." Officer Catherman also noted that petitioner's speech was "slow and slurred." At this point, he asked petitioner to exit her motor vehicle to perform several standardized field sobriety tests. Officer Catherman administered three field sobriety tests [6] and subsequently informed petitioner that her performance on these tests was consistent with the presence of alcohol in the body. He further testified that petitioner responded by stating "okay, I'll tell you the truth, I've had two drinks, but I'm really just tired." At this point he determined that he had probable cause to place petitioner under arrest and had her transported to the Howard County Southern District Police Station. He further testified that her demeanor from the time of initial contact until she took the breath test was polite and cooperative.

At the police station, Officer Karen Slack advised petitioner of her rights pursuant to Maryland Code (1974, 1998 Repl.

---

**6.** The three tests administered were: (1) the horizontal gaze nystagmus test; (2) the walk and turn test; and (3) the one leg stand test. The horizontal gaze nystagmus test is an evaluation of the natural moving of the human eye as it follows a horizontally moving point of reference. The presence of alcohol in the body causes the eyes to take on a jerking movement. The walk and turn test requires a person to walk toe-to-heel on a straight line for approximately nine to ten steps. The one leg stand test requires a person to stand on one leg and count out loud for a approximately five to ten seconds.

Vol., 2000 Cum.Supp.), section 10–309(a) of the Courts and Judicial Proceedings Article and section 16–205.1(b) of the Transportation Article [7] to submit to or refuse to submit to a test to determine alcohol concentration.[8]  She elected to submit to the Breathalyzer test.  Sergeant Mitchell, a State-certified toxicologist, administered the initial test at approximately 12:25 a.m. on September 4, 1998 [9] by utilizing an Intoximeter 3000.  As Sergeant Mitchell testified, under the regulations of the toxicologist for the State of Maryland, a test actually consists of two breath samples in order to compare the samples to ensure that the instrument is in proper working order.  *See Regulations of the Toxicologist Post Mortem Examiners Commission State of Maryland Regarding Tests of Breath and Blood for Alcohol* (October 1, 1995) at 13–15.[10] Petitioner's first sample taken during the first test indicated a reading of 0.173, but her second sample in the first test read "insufficient breath." [11]  Starting at approximately 12:44 a.m.

---

7.  Both statutes state that a person may not be compelled to submit to such a test.

8.  This was done by reading petitioner a DR–15 Advice of Rights form informing her of the possibility that her license would be suspended if she submitted to a test for alcohol and was found to have an alcohol concentration of 0.10 or more, or if she refused to take such a test.

9.  Because petitioner was pulled over at approximately 11:15 p.m. on September 3, 1998, the test was administered within the two hour time limit mandated by Maryland Code (1974, 1998 Repl.Vol.), section 10–303(a)(2) of the Courts and Judicial Proceedings Article.

10.  This document provides, "These regulations are set forth pursuant to the responsibility directed to the Toxicologist under the Post Mortem Examiners Commission under Section 10–304 of the Courts and Judicial Proceedings Article, Annotated Code of Maryland." *Id.* at 2.

11.  Pursuant to Maryland Code (1974, 1998 Repl.Vol., 2000 Cum.Supp.) section 10–307(d) of the Courts and Judicial Proceedings Article, an alcohol concentration of greater than 0.07 but less than 0.10 "shall be prima facie evidence that the defendant was driving while under the influence of alcohol."  " 'Intoxication per se' means having an alcohol concentration at the time of testing of 0.10 or more." Md.Code (1977, 1999 Repl.Vol.) section 11–127.1(a) of the Transportation Article.  As we discussed, *supra*, note 6, none of the test results were admitted into evidence.

on September 4, 1998, Sergeant Mitchell administered the sampling procedure two more times and on each occasion the device read "interfering substance." [12] Petitioner testified that, at this point in time, she requested a blood test to prove that she was not under the influence of alcohol.[13] Both Officer Catherman and Sergeant Mitchell testified that they did not recall her requesting a blood test.

Officer Catherman arrested and charged petitioner with "driving while intoxicated" on the basis of his prior observations of both her driving and her field sobriety tests. Both Officer Catherman and Sergeant Mitchell testified on direct examination that petitioner became upset and argumentative when she was told that she was being charged despite the absence of a result stated in percentages from the Intoximeter. When asked on direct examination whether petitioner made any statements to him as he was issuing her the citations, Officer Catherman testified, without any objection from petitioner: [14]

Yes, she did. She stated that she had only had two glasses of wine. As I was issuing the tickets, she stated to me, what you going to charge me? These results are not admissible in Court. She stated to me, don't you think you should be out getting some real criminals? You ought to

---

12. Sergeant Mitchell explained that a reading of "interfering substance" means that the Intoximeter has taken a first reading and is attempting to take a second reading but alcohol from the first reading has not yet dissipated from the instrument. The instrument reads "interfering substance" to prevent an inaccurate measurement of alcohol concentration.

13. Only thirty minutes then remained in the two-hour window in which the law permits tests to be given. The record is silent as to other facts from which one could assess whether this period would have been adequate to transport petitioner to an appropriate health care facility and to have a blood sample drawn.

14. In her brief to this Court, petitioner asserts this testimony was admitted in error. As we indicated, she made no objection at trial. Moreover, the question was not presented in her Petition for Certiorari and was waived at oral argument. *See, supra,* note 4.

get a new hobby. The result of 1 7 is not admissible in Court.

In a bench trial before the District Court of Maryland sitting in Howard County, petitioner argued that, pursuant to Maryland Code (1977, 1999 Repl.Vol., 2000 Cum.Supp.), section 16–205.1 of the Transportation Article and Maryland Code (1974, 1998 Repl.Vol., 2000 Cum.Supp.), sections 10–302 through 10–309 of the Courts and Judicial Proceedings Article,[15] the State had a mandatory statutory duty to provide a test for alcohol concentration to petitioner. Petitioner further argued that pursuant to *State v. Werkheiser*, 299 Md. 529, 474 A.2d 898 (1984), she should be allowed an inference at trial that had a blood test for alcohol concentration been administered the result thereof would have been favorable to petitioner. After an argument by the State, the District Court granted petitioner's request that a *Werkheiser* inference be made. Petitioner was, nonetheless, convicted of driving under the influence of alcohol, as well as failure to obey a proper traffic control device and failure to display a registration card on demand.

Petitioner appealed to the Circuit Court for Howard County. From the entries transcribed in the court docket it appears that petitioner submitted a motion requesting a *Werkheiser* inference on August 11, 1999, which was never forwarded to a circuit court judge. An almost identical motion was filed on December 21, 1999. Neither written motion included any request for an instruction as to the inference. It appears that rather than rule on the motion prior to trial, the trial judge waited until the close of all evidence to rule. At trial, on March 16, 2000, defense counsel argued for the first time that, in addition to being permitted to argue a *Werkheiser* inference to the jury, the inference should also be included as a jury

---

**15.** All reference, *supra* and *infra*, to sections in the Courts and Judicial Proceedings Article refer to the 1998 Replacement Volume or 2000 Cumulative Supplement, unless otherwise stated. *See, supra,* notes 1 and 5.

instruction. The jury instruction proposed by petitioner provided in relevant part:

When a person is detained on suspicion of driving while under the influence of alcohol, Maryland law places a mandatory duty upon the detaining officer to request the person submit to a test to determine alcohol concentration. This person can agree to submit to a test or refuse. (Transportation Article § 16–205.1). When a person consents to the administration of a test to determine alcohol concentration, Maryland law requires that the test to be administered shall be a test of breath unless the person is unconscious or otherwise incapable of refusing to take a test to determine alcohol concentration, or the person has injuries which require their removal to a medical facility, or the equipment to administer the breath test is unavailable. Under those circumstances Maryland law provides that a blood test shall be administered. (Courts & Judicial Proceedings § 10–305).

Maryland law places a mandatory duty upon a police officer to administer a test for alcohol concentration when a person consents to such a test. If the officer fails to comply with that statutory duty the courts in this state have held the person arrested is entitled to an inference at trial that had the test been administered, the results of that test would have been favorable to that person. ( [*State v. Werkheiser*], 299 Md. 529, 474 A.2d 898 (19[8]4)).[16]

The trial judge denied the motion, stating:

All right. The Court has considered this issue and read the State versus Werkhei[s]er case at 299 Maryland 529, [474 A.2d 898] 1984, case. The way the Court reads the situation is that the conviction can be sustained without a test if there is other competent evidence with other appro-

---

**16.** We point out again that a Breathalyzer test was administered. Appellant's argument, therefore, is predicated on an assumption that the officer, when the Breathalyzer test did not produce a percentage reading, had a mandatory duty to provide petitioner with a blood test upon her alleged request for one.

priative evidence, if there is any competent evidence which is sufficient to establish the offense in the case and the Court does not believe that an instruction, such as the one requested by the Defendant is either necessary or appropriate in this case. The Defendant can certainly argue that defects in the test and the procedure that was utilized here *and the lack of confirmatory testing that would have [in ] their view exonerated the Defendant,* and that certainly is an argument that can be made, but the Court does not believe the instruction ... by the Defense is appropriate and the Court will therefore, not give the bracketed part of pages 10 and 11.[17]   [Emphasis added.]

During closing argument, defense counsel was given the opportunity to argue to the jury that petitioner should have been given a blood test, implying that, had it been given, it would have proven her innocence.  He argued:

Under Maryland law, the test to administer, at no cost to you, shall be the test of breath, however, a test of blood shall be administered if the equipment for administering the breath test is not available.  That's the law....  Now, what bothers me most in this case is when a person is taken into custody and they lose their liberty, and we allow the police to do that because we have laws, she is taken—she is arrested—she can't say I want to go get a blood test or anything like that kind of stuff.  She is in custody.  She is handcuffed or whatever and down at the police station.  She is taken down there and she goes and blows into a breath machine one time and remember what the police [sergeant] said, sitting back there, he said, hey, they're only supposed to take it one time.  But the police were being nice....  They had her a second time, whoopee, but this—you know, and then she tried it a third time.  What was she trying to do?  You're darn right she was trying to give a breath sample, and you're darn right this machine was malfunction-

**17.**  Apparently, the bracketed parts of pages 10 and 11 refer to the two paragraphs presented as the proposed jury instruction which we have just discussed, *supra.*

ing, and you're darn right that the police didn't follow the law, because what is the law when the machine—when the breath test operation is not available, now, look for the words here, right here in the statute. . . . It says however, a test of blood shall be administered. . . . But this is very important words, shall, when the mandatory word, shall, comes, let's make it a level playing field. Let's make the police do what they are required to do. You take away a person's liberty and make the police follow—follow their law. . . . I submit, in this particular case, that no one knew what was happening. Police officer says, with certainty, . . . in a thousand cases he's given, he's never seen one of these, interfering substances. Oh, boy, that sounds like somebody, there's something about something happening here that I don't know what happened here, but clearly, no one knew what was happening. . . . [W]e know that the police didn't know what to do at that particular point. Read the rule of law. See what they should have done. *They should have given her a blood test at that particular point. Now, that's our defense.* And, you know that's our defense. . . . I'm going to say to use your common sense. Use your own experiences. Imagine you're out there, in the middle of the night, and you get arrested for drunk driving, and you try three times to take a Breathalyzer and that thing fails. But by your implications, well, that's not right, we all know that's not right. What's wrong in that? *Because she was not given a chance to prove her innocen* [c ]e. . . . I don't know what happens to justice, *all I know is that my client was denied her right to be able to prove her innocence.* [Emphasis added.]

## II. Discussion

The controlling statutes are section 16–205.1 of the Transportation Article and section 10–305 of the Courts and Judicial Proceedings Article. We said in *State v. Loscomb,* 291 Md. 424, 435, 435 A.2d 764, 770 (1981) that "§ 10–302 through § 10–309 and § 16–205.1(c), like their predecessors, are in *pari materia.* They must be construed harmoniously in order

to give full effect to each enactment." The current statutes are construed similarly; harmoniously. *See Hyle v. Motor Vehicle Administration,* 348 Md. 143, 149–50, 702 A.2d 760, 763 (1997).

Section 16–205.1 states in relevant part:

**§ 16–205.1.  Suspension or disqualification for refusal to submit to chemical tests for intoxication.**

(a) *Definitions; implied consent to chemical test.*—(1)(i) In this section, the following words have the meanings indicated.

. . . .

(iii) "Test" means:

1.  A test of a person's breath or of 1 specimen of a person's blood to determine alcohol concentration;

. . . .

(2) Any person who drives or attempts to drive a motor vehicle on a highway or on any private property that is used by the public in general in this State is deemed to have consented, subject to the provisions of §§ 10–302 through 10–309, inclusive, of the Courts and Judicial Proceedings Article, to take a test if the person should be detained on suspicion of driving or attempting to drive while intoxicated, while under the influence of alcohol, while so far under the influence of any drug, any combination of drugs, or a combination of one or more drugs and alcohol that the person could not drive a vehicle safely, while under the influence of a controlled dangerous substance, in violation of an alcohol restriction, or in violation of § 16–813 of this title.

(b) *No compulsion to take chemical test; consequences of refusal.*—(1)  Except as provided in subsection (c) of this section, a person may not be compelled to take a test. . . .

(2) Except as provided in subsection (c) [18] of this section, if a police officer stops or detains any person who the police

---

**18.**  Subsection 16–205.1(c) specifies circumstances where an individual is *required* to take a alcohol concentration test.  It is distinguished from

officer has reasonable grounds to believe is or has been driving or attempting to drive a motor vehicle while intoxicated, while under the influence of alcohol, while so far under the influence of any drug, any combination of drugs, or a combination of one or more drugs and alcohol that the person could not drive a vehicle safely, while under the influence of a controlled dangerous substance, in violation of an alcohol restriction, or in violation of § 16–813 of this title, and who is not unconscious or otherwise incapable of refusing to take a test, the police officer shall:

(i) Detain the person;

(ii) Request that the person permit a test to be taken; and

(iii) Advise the person of the administrative sanctions that shall be imposed for refusal to take the test, including ineligibility for modification of a suspension or issuance of a restrictive license under subsection (n)(1) or (2) of this section, and for test results indicating an alcohol concentration of 0.10 or more at the time of testing.

Section 10–305 provides:

**§ 10–305.  Same—Type of test administered.**

(a) *Alcohol content.*—The type of test administered to the defendant to determine alcohol concentration shall be the test of breath except that the test of blood shall be the type of test administered if:

(1) The defendant is unconscious or otherwise incapable of refusing to take a test to determine alcohol concentration;

(2) Injuries to the defendant require removal of the defendant to a medical facility;  or

(3) The equipment for administering the test of breath is not available.

(b) *Drug or controlled dangerous substance content.*—The type of specimen obtained from the defendant for the

---

subsection (b) where an individual may not be compelled to take such a test.

purpose of a test or tests to determine drug or controlled dangerous substance content shall be a blood specimen.

(c) *Person incapable of test refusal.*—Any person who is dead, unconscious, or otherwise in a condition rendering him incapable of test refusal shall be deemed not to have withdrawn consent.

### Arguing for an Inference, not an Instruction, was the Appropriate Remedy

Petitioner contends that the appropriate remedy when the State does not produce an alcohol concentration test result in terms of percentages, as opposed to producing such a result, is for the trial court to give an instruction to the jury stating, as a matter of law, that the accused is entitled to an inference that, had a blood test been administered, the results would have been favorable to petitioner. We disagree.

In *Werkheiser,* 299 Md. 529, 474 A.2d 898 (1984), we analyzed the same statutory scheme as we do in the case *sub judice.* In that case, Werkheiser was involved in a single car accident and rendered unconscious. The police officer who arrived on the scene had reasonable grounds to believe that Werkheiser was driving while intoxicated or under the influence of alcohol based on the smell of alcohol on Werkheiser and in his car. An unconscious Werkheiser was transported to a hospital and subsequently charged with a violation of section 21–902(b). The different statutory provision there involved mandated that, under the circumstances then existing, a police officer must procure a sampling of the blood of the driver.[19] The police officer failed to direct that a blood test be administered because he was unaware of the statutory requirement, under the facts of that case, that he procure such a test. We held that the provisions of sections 16–205.1(d) and 10–305(b) made such a test mandatory. We held that "the appropriate remedy available ... [under the circumstances present in *Werkheiser* ] would be to allow an inference that

---

19. Unlike the provisions of the statutes involved in the case at bar.

had the test been administered, the result thereof would have been favorable to him, to be weighed by the trier of fact along with all the other evidence presented, including the officer's reasons for not directing that the test be administered." *Id.* at 538, 474 A.2d at 903.

We noted additionally:

However, there is no indication, and the legislature obviously intended none, to suggest that in *any* prosecution for an alcohol related offense the chemical test is a prerequisite to a prosecution.

*Id.* at 536, 474 A.2d at 902.

In *Werkheiser,* quoting favorably from *People v. Culp,* 189 Colo. 76, 537 P.2d 746 (1975) (en banc), we noted:

". . . We quote from [*State v.*] *Reyna, [*92 Idaho 669, 448 P.2d 762 (1968) ] and adopt the Idaho Supreme Court's disposition of this argument:

'. . . the right to due process of law does not include the right to be given a blood test in all circumstances. To hold otherwise would be to transform the accused's right to due process into a power to compel the State to gather in the accused's behalf what might be exculpatory evidence. . . . [The State] had no obligation to obtain for appellant what he speculates might have been more scientific evidence of sobriety. . . .' "

*Id.* at 537–38, 474 A.2d at 903. We agreed with the Colorado Court, stating further: "We . . . find the situation analogous to other forms of evidence which the [S]tate may not have available for trial." *Id.* at 538, 474 A.2d at 903. We then noted our holding in *Eley v. State,* 288 Md. 548, 419 A.2d 384 (1980), involving the absence of fingerprint evidence. Quoting from *Eley* in respect to what may be appropriate when such evidence is absent, we stated "it is not unreasonable to allow the defendant to call attention to [the State's] failure to do so." *Id.* at 538, 474 A.2d at 903.

We then noted that a sufficient remedy was to "allow an inference." *Id.* We ultimately held that when a chemical analysis is not offered by the State, it may "attempt to meet

its burden of proof with other probative evidence." *Id.* at 540, 474 A.2d at 904.

■ The State, in many circumstances, is compelled to preserve evidence in its possession and to produce it upon proper request and/or to produce it without request if it tends to exculpate a defendant. Generally, it is not required to generate or find evidence favorable to a defendant. The position taken by the petitioner, that the State either conduct a blood test or that the Court instruct the jury that the failure of the State to conduct a blood test leads to an inference that it would be exculpatory, in effect, would impose a burden on the State to generate or find exculpatory evidence. We have not yet placed such a burden on the State under conditions similar to those here present and are unwilling to do so under these circumstances.

We recently had the opportunity to again evaluate the law concerning missing evidence instructions in Maryland in *Patterson v. State*, 356 Md. 677, 685, 741 A.2d 1119, 1123 (1999).[20] In *Patterson*, the defendant was charged with possession with intent to distribute cocaine found in a jacket in an automobile he was driving. The defense theory of the case was that the jacket belonged to someone else and Patterson claimed that if the jacket was produced and he were to try it on, the jacket would not fit him. The police officers who arrested Patterson had photographed the jacket but did not retain it as evidence. Defense counsel requested that an instruction be given to the jury stating that because the State failed to produce the jacket, "you may decide that the evidence would have been unfavorable to the State." *Id.* at 682, 741 A.2d at 1121. The trial court refused to deliver the instruction. Instead the trial judge allowed defense counsel to argue the inference to the jury during closing argument. When considering the weight that should be given to missing evidence we said:

---

**20.** In light of our holding on the second question, we do not directly address whether evidence was, in fact, missing in this case.

An evidentiary inference, such as a missing evidence or missing witness inference ... is not based on a legal standard but on the individual facts from which inferences can be drawn and, in many instances, several inferences may be made from the same set of facts. A determination as to the presence of such inferences does not normally support a jury instruction. While supported instructions in respect to matters of law are required upon request, instructions as to evidentiary inferences normally are not.

. . . .

... When evidence is missing, apparently due to the act or omission of one of the parties, an inference that the evidence would have been unfavorable to that party may be appropriate. That is all that is required.... We now further refine the issue in the case *sub judice* by holding that, regardless of the evidence, a missing evidence instruction generally need not be given; the failure to give such an instruction is neither error nor an abuse of discretion.

*Id.* at 685, 688, 741 A.2d at 1123, 1124. We also noted in *Patterson* that:

Maryland Rule 4–325(c) imposes a requirement that instructions be given in respect to the applicable law in a case. It does not apply to factual matters or inferences of fact.

*Id.* at 684, 741 A.2d at 1122. Although it was not the holding in the case, we opined that instructions that inferences not be made, might be appropriate where there is no evidentiary support for the inference. *Davis v. State,* 333 Md. 27, 49, 633 A.2d 867, 879–80 (1993). We quoted from *Robinson v. State,* 315 Md. 309, 318, 554 A.2d 395, 399 (1989):

Only if, as a matter of law, the unfavorable [or favorable] inference could not have been drawn by the jurors would the trial judge have been authorized to prohibit the prosecutor from posing that same question in argument.

*Davis,* 333 Md. at 49, 633 A.2d at 878. It might be argued that an instruction to the same effect would not be error under such circumstances. We, however, emphasized that the better practice is to permit the party to argue for the drawing of

inferences rather than to have the court instruct the jury. Speaking of inferences, we said:

> Where a party raises the missing witness rule during closing argument, its use is just that—an argument.... Furthermore, the opposing side also has an opportunity to refute the argument and counter with reasons why the inference is inappropriate.
>
> In contrast to the argument context is the trial judge's instruction to the jury. In the latter case, the inference is communicated to the jury as part of the judge's binding jury instructions, creating the danger that the jury may give the inference undue weight.... A trial judge has discretion to deny a missing witness instruction, leaving the matter to closing arguments, even when the facts would support the inference.

*Davis,* 333 Md. at 52, 633 A.2d at 879–80; *see also Bruce v. State,* 318 Md. 706, 569 A.2d 1254 (1990).

█ In accordance with *Patterson* and *Werkheiser,* even if the State had a duty to administer a blood test to determine alcohol concentration after the "0.173%," "insufficient breath," and "interfering substance" readings were produced by the breath tests, the appropriate remedy to cure the alleged error was to allow an inference to be argued to the jury during closing argument. The circuit court judge informed petitioner that an inference was appropriate and defense counsel had the opportunity to, and did, argue for an inference to the jury during closing argument. That is all to which petitioner was entitled. Accordingly, we affirm the ruling of the Circuit Court for Howard County.

**JUDGMENT OF THE CIRCUIT COURT FOR HOW-ARD COUNTY AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

CATHELL, Judge, Concurring:

I concur with the reasoning of the Court's opinion and its resolution of the second question; thus, I also concur in the result. I write separately because I feel that we should also

resolve the first question. Additionally, I disagree with the views expressed in respect to that first question by Chief Judge Bell in his dissent.

While I agree that, generally, Maryland Code (1977, 1999 Repl.Vol., 2000 Cum.Supp.), section 16–205.1 of the Transportation Article[1] does impose a mandatory duty upon officers to provide a test for alcohol concentration when a detained person consents to the taking of the test, I would not hold that such a test needs to produce a percentage reading that might result in admissible evidence. Sometimes, as in this case, results generally admissible as evidence cannot be obtained. In the case *sub judice*, the Howard County Police took four samples as part of three tests for alcohol concentration on an approved intoximeter that was in proper working order.[2] In my view, the machine performed as it was designed to operate on all four occasions. On the first sample of the first test it registered "0.173" followed by "insufficient breath" on the second sample. The second sampling was to confirm the first result. On two subsequent samplings, it registered "interfering substance." When the first sample of the second test indicated "interfering substance," the officer began another test and the first sample of that test also indicated "interfering substance." At that point, with only thirty minutes remaining in the statutorily mandated testing period, he ceased administering the test.

In my view, there was no evidence of a machine malfunction—the results given are what the device is designed to register when certain conditions exist. The fact that the test results did not provide a percentage reading that might be

---

**1.** Any future reference to section 16–205.1 is a reference to Maryland Code (1977, 1999 Repl.Vol., 2000 Cum.Supp.) section 16–205.1 of the Transportation Article. As we discussed, *supra,* note 1, although petitioner was arrested and charged in 1998, we are citing the current statutes as no relevant substantive changes have occurred since 1998.

**2.** Generally, a test is considered to be two samplings of breath. When the first sample of a test reads "interfering substance," a new test is commenced. There were four samplings in the case *sub judice* in three tests.

admissible as evidence [3] of intoxication or sobriety did not, in my view, then impose upon the State the additional duty of administering a blood test for alcohol concentration even if there was a facility in close proximity, where petitioner could have been transported and blood taken within the thirty minutes remaining of the testing period.

## II. Analysis

While section 16–205.1 of the Transportation Article may generally impose a duty upon officers to obtain a test for alcohol concentration when a detained person consents to the taking of the test, I would not hold that such a test needs to produce admissible percentage results. Such tests do not always produce such results. The fact that, in the case *sub judice*, the test results did not provide admissible percentage evidence of intoxication or sobriety did not, as I perceive it, then impose upon the State the additional duty of further administering a blood test for alcohol concentration. To the extent blood test evidence might be exculpatory, the State is not generally required to generate such evidence. It must produce it if it has it, but normally the State is not required to undertake processes that might lead to the creation of exculpatory evidence. Under the facts of this case a blood test to

---

**3.** It might be argued that, generally, the first sample of the first test 0.173 might have to have been confirmed by the second sample of the first test in order to be admissible although I am unaware of any such statutory requirement. It is the procedure outlined in the regulations of the State toxicologist that require a second reading. In this case, the samplings' results were marked as State's Exhibits 4A, 4B, and 4C for identification purposes only. The State began to introduce them into evidence but a timely objection by defense counsel was sustained by the trial court. Apparently the results were kept out because they were believed to be inconclusive, and thus not sufficiently relevant, and the results of the first sample of the first test would be more prejudicial than probative. I do note that the admissibility of such test results are controlled by sections 10–306 and 10–307 of the Courts & Judicial Proceedings Article. There is nothing in the language of that statute, as I read it, which discusses the evidentiary admissibility of results other than those stated in percentages. Section 10–306, in respect to admissibility without the presence of a technician, is framed in terms of "results" of the tests. Section 10–307 speaks to the admissibility of "the amount ... as shown by analysis."

determine alcohol concentration was not, in my view, mandated in the first instance.

I note initially when attempting to discern the intention of the Legislature in enacting a particular statute, we recently said in *Edgewater Liquors, Inc. v. Liston*, 349 Md. 803, 709 A.2d 1301 (1998):

> "In construing the meaning of a word in a statute, the cardinal rule is to ascertain and carry out the real legislative intention." Legislative intent generally is derived from the words of the statute at issue. "We are not constrained, however, by ... 'the literal or usual meaning' of the terms at issue." "Furthermore, we do not read statutory language 'in isolation or out of context [but construe it] in light of the legislature's general purpose and in the context of the statute as a whole.'"

*Id.* at 807–08, 709 A.2d at 1303 (internal citations omitted) (alteration in original). We commented in an earlier case:

> When we pursue the context of statutory language, we are not limited to the words of the statute as they are printed in the Annotated Code. We may and often must consider other "external manifestations" or "persuasive evidence," including a bill's title and function paragraphs, amendments that occurred as it passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.
>
> ... Thus, in *State v. One 1983 Chevrolet Van*, 309 Md. 327, 524 A.2d 51 (1987), .... [a]lthough we did not describe any of the statutes involved in that case as ambiguous or uncertain, we did search for legislative purpose or meaning—what Judge Orth, writing for the Court, described as "the legislative scheme." .... *See also Ogrinz v. James*, 309 Md. 381, 524 A.2d 77 (1987), in which we considered legislative history (a committee report) to assist in constru-

ing legislation that we did not identify as ambiguous or of uncertain meaning.

*Kaczorowski v. Mayor & City Council of Baltimore,* 309 Md. 505, 514–15, 525 A.2d 628, 632–33 (1987); *see Laznovsky v. Laznovsky,* 357 Md. 586, 606–07, 745 A.2d 1054, 1065 (2000); *State v. Bell,* 351 Md. 709, 717–19, 720 A.2d 311, 315–16 (1998); *see also Williams v. Mayor & City Council of Baltimore,* 359 Md. 101, 115–17, 753 A.2d 41, 49 (2000); *Riemer v. Columbia Medical Plan,* 358 Md. 222, 235–36, 747 A.2d 677, 684–85 (2000).

Read together, section 16–205.1 of the Transportation Article and section 10–305 of the Courts and Judicial Proceedings Article control the actions that a law enforcement officer must take when stopping or detaining any person who the officer has reasonable grounds to believe is or has been driving or attempting to drive a motor vehicle while intoxicated or under the influence of alcohol. First, provided that such a test is not mandatorily required under subsection 16–205.1(c),[4] the officer is to detain the person, request that the person permit a test to be taken, and advise the person of the administrative sanctions that shall be imposed for refusal to take the test. If the detained individual elects to take a test, section 10–305(a) mandates that the test *shall* be a breath test except in three circumstances. Only when: (1) the individual is unconscious or otherwise incapable of refusing to take a test to determine alcohol concentration; (2) injuries to the defendant require removal of the defendant to a medical facility; or (3) the equipment for administering the test of breath is not available, shall a blood test be administered.

In the case *sub judice,* the police officers followed the requirements of these two statutes. Officer Catherman pulled over petitioner's vehicle after it demonstrated signs of erratic driving by crossing the right side lane marker and quickly swerving back onto the road. When Officer Catherman ap-

---

**4.** If a person is involved in an accident resulting in a fatal or life threatening injury, and an officer believes the person was under the influence of alcohol, the person's consent is not necessary.

proached petitioner's vehicle, he smelled alcohol, noticed that petitioner's eyes were bloodshot, and that her speech was slurred. After conducting field sobriety tests, Officer Catherman determined that he had reasonable grounds to believe that petitioner was driving while under the influence of alcohol. At this point, in accordance with section 16–205.1(b), he detained petitioner and took her to a police station to conduct breath tests to determine alcohol concentration.

Once at the police station, in accordance with section 16–205.1(b), petitioner was advised of her rights to refuse or to submit to a test, and was asked if she would submit to a breath test. Petitioner agreed and Sergeant Mitchell administered several breath tests on the Intoximeter 3000. The first sample gave a reading of "0.173," the second sample gave a reading of "insufficient breath," and the third and fourth samples both gave readings of "interfering substance." The Intoximeter 3000 performed as it was designed to do. It gave four readings based on petitioner's breath samples' inputs. The statutes do not require that a blood test be offered to a conscious defendant when a properly operating machine fails to produce a potentially admissible result. The Legislature has mandated that when an individual requests an alcohol concentration test, the test *shall* be a breath test except under three specific sets of circumstances, none of which apply here.

In respect to the first question, petitioner argues, in essence, that the police were required to administer a blood test to determine alcohol concentration when the Intoximeter 3000 failed to provide a result stated in percentages. Her rationale, and that of the dissent, is that because the Intoximeter 3000 failed to provide such a result, it is as if the equipment for administering the test of breath was not available. Thus, she, and the dissent, contend that under section 10–305(a)(3), the police were mandated to administer a blood test to determine alcohol concentration. I disagree.

The breath test equipment was available at the time of petitioner's arrest and it was utilized in an attempt to obtain results that might be admissible. The Intoximeter 3000 was

never shown to be functioning in any way other than a proper manner. It is designed to indicate "insufficient breath" when a person being tested provides insufficient breath. That is what it did during the second sampling when petitioner, who had just found out that her prior test had produced a percentage reading of 0.173 (a level far above the level of intoxication), failed to produce a sufficient quantity of breath to be tested.[5] Two other tests consisting of one sample for each test breathed into the machine by appellant were administered. The machine indicated that there was an "interfering substance." When the machine detects an interfering substance, it is designed to so indicate and to not produce a percentage figure, presumably because such a percentage figure, under those circumstances, might not be accurate. That is what the device did in the case *sub judice*. In other words, the device operated properly. The dissent argues that because the device did not produce a percentage result, it was "unavailable," stating "the results of the [B]reathalyzer's operation ... are proof positive that the [B]reathalyzer ... was not 'in proper working order.' ... [A] machine that does not produce, or is incapable of producing, the results it was designed to produce serves no useful purpose and is, thereby, rendered unavailable for purposes of § 10–305. That is simply a matter of common sense and logic."

I disagree with the premise of the dissent. The machine, as I have indicated, is apparently designed to indicate "insufficient breath" when that situation exists, and to indicate "interfering substance" when that situation exists. That, in my view, is the better common sensical and logical position. If

5. One inference that can be raised from petitioner's paraphrased statements to the police when the citations were issued that "these results are not admissible in court.... The result of 1 7 is not admissible in court," is that petitioner was familiar with the admissibility requirements for Breathalyzer evidence at the time the samplings were taken. The record reflects that in January of 1996, just a year and nine months before her arrest in the case at bar, she was placed on probation before judgment for driving under the influence of alcohol and for a period of time, within a year of her arrest in this case, her driving privileges had been suspended in respect to that prior offense.

the dissent's view of "common sense and logic," were to prevail, it would completely eliminate the viability of Breathalyzer testing. The dissent states "When it does not produce such a [percentage] result, it is not working properly." Under that rationale, a person being tested could simply withhold sufficient breath as petitioner may have done when called upon to furnish the second sample, resulting in an "insufficient breath" reading, and preventing the device from registering a percentage result. Under the dissent, the machine would then be "unavailable" and a blood test mandatory.[6]

In short order, it would become known that all one had to do to beat a Breathalyzer test was to withhold breath, thereby making the machine "unavailable." She or he could then argue that they had consented (thereby retaining their driving privileges under the implied consent provisions of the statutes), but argue that the machine was not operable, i.e., not available. Then the officer would be required to obtain blood tests. In other words, the dissent's position would be the death knell for the utilization of Breathalyzer testing in Maryland, when, clearly, it is the method that the Legislature has indicated it prefers.

The readings that the machine displayed were consistent with its programming and function—it merely was not providing percentage results as to the sobriety or intoxication of petitioner. As discussed, *supra,* Petitioner's first test consisted of two samples, the second of which recorded "insufficient breath." The regulations of the toxicologist contemplate situations where percentage readings are not obtained based upon insufficient breath and provides the following guidance:

> The test sequence is now completed and the results are printed. If the subject fails to complete the required test sequence by either not providing sufficient breath samples as indicated by the instrument or failing to give samples

---

**6.** The dissent leaves unanswered what would happen if the person consents to a breath test, withholds breath thereby thwarting the testing process, but then declines to consent to the more invasive procedure of blood sampling.

when directed to do so by the Operator, then the test shall be considered incomplete and shall be recorded in the State of Maryland Alcohol Testing Log as a refusal.

*Regulations of the Toxicologist* at 15. This language recognizes that the breath testing equipment may not always provide its operators with percentage-based results. No where does it suggest that additional Breathalyzer tests be administered or that a blood test would then be required.[7]

This Court recently had the opportunity to analyze section 10–305 in *Hyle*, 348 Md. 143, 702 A.2d 760. In that case, an individual, Hyle, was suspected of driving while intoxicated. Similar to the petitioner in this case, he admitted to drinking, smelled of alcohol, and performed poorly on field sobriety tests. He was arrested and taken to the Central District Police Station in Baltimore City where, after being informed of his rights, he agreed to take a breath test. Because no qualified technician was available to perform the breath test, Hyle was told that he would be transported to Mercy Hospital for a blood test. Hyle refused to take the blood test and subsequently had his license suspended for 120 days. His appeals of the administrative suspension of his driving privileges, to both an administrative law judge and the Circuit Court for Worcester County, were affirmed.[8] We reversed, holding that a motorist detained on suspicion of drunk driving was not required to submit to a blood test solely because there was no qualified person available to administer a breath test. Before this Court, Hyle successfully argued that the equipment to conduct the test was available and that the fact that there was no qualified person to administer the test did not make the equipment unavailable. Thus, a blood test was not compelled because the exception outlined in 10–305(a)(3) was not applicable to the facts in *Hyle*.

---

7. This regulation would not appear to prohibit additional consensual testing but it certainly does not require it.

8. Hyle was detained in Baltimore City but appealed the suspension of his license in Worcester County.

Similarly, the exception outlined in 10–305(a)(3) is not applicable to the facts of the case *sub judice*. The Court noted in *Hyle*, 348 Md. at 151, 702 A.2d at 764, that "the statute does not provide an exemption where the 'test' is unavailable, but instead uses the specific term 'equipment.'" The Court stated that, "[w]hile it is possible to say that the test cannot be administered without a qualified person and, thus, without a qualified person the 'test' is unavailable, the same cannot be said with respect to equipment." *Id.* Similarly, in the case at bar, although admissible percentage readings were not obtained, it cannot be said that the equipment used to administer the test was not available.[9]

Maryland has demonstrated a clear preference for breath tests over blood tests in the determination of alcohol concentration. *Hyle* provides a background behind this preference and substantial history behind the evolution of section 10–305:

> Prior to a 1983 amendment, § 10–305 permitted the defendant to choose whether to take a blood test or a breath test. Chapter 289 of the Acts of 1983. Concern arose regarding the increasing number of defendants choosing blood tests over breath tests because of: (1) the difficulty of accomplishing the blood test in certain situations; (2) the delay in processing caused by administering blood tests instead of breath tests; and (3) the problems caused by the necessity to have medical personnel attend hearings where a blood test was used. *See, e.g.,* Testimony of [then] Lieutenant Governor J. Joseph Curran, Jr., before the Senate Constitutional and Public Law Committee (Senate Bill 513) and the House Judiciary Committee (House Bill 885); Summary of Committee Report, Part III, of the Senate Constitutional and Public Law Committee, Senate Bill 513 of 1983; Maryland Department of Transportation, Position on Proposed Legislation on Senate Bill 513 (February 23, 1983).

---

9. In this case, the equipment was present and operating properly—it merely was not providing an admissible percentage reading. This is not, in my view, a case where the equipment, though present, is inoperable. The equipment operated. It just did not produce a percentage reading.

When § 10–305 was being amended, it originally called for the police officer to select the type of test. Ch. 238 of the Acts of 1983. As originally drafted, the bill read: "The defendant's failure to take the test selected by the police officer is a refusal to take the test, . . . unless failure to take the test is due to facilities or equipment not being available for the administration of the test." *Id.* The purpose was originally stated as follows: "FOR the purpose of permitting the police officer to select the type of test for alcohol or drugs to be administered to a defendant. . . ." *Id.* This version, however, did not pass. In fact, "[t]he bill failed 28–17 after a number of senators complained that it would give too much discretion to law enforcement officers and harm motorists' rights." Tom Linthicum, *Bill to tighten intoxication tests given new life,* BALTIMORE SUN, March 16, 1983, at F14.

The version that ultimately passed eliminated officer discretion with respect to the type of test to be administered, and instead statutorily determined which type of test would be administered: "FOR the purpose of designating the type of test for alcohol or drugs to be administered to a defendant under certain circumstances. . . ." Ch. 289 of the Acts of 1983. The final version stated that the breath test would be the test to be administered, but carved out three exceptions including the one at issue in [the *Hyle* ] case.

In enacting this legislation, the legislature did not altogether ban the use of blood tests, but did express a clear preference for breath tests while severely restricting situations where a blood test could be used. An examination of the bill file reveals that the legislature was provided with ample evidence that breath tests were preferable to blood tests. *See, e.g.,* Summary of Committee Report, Part III, of the Senate Constitutional and Public Law Committee, Senate Bill 513 of 1983 (describing one of the purposes of the bill as "prevent[ing] defendants from subverting the administration of a test, and . . . aid[ing] in the prosecution of drunk driving cases by obviating the necessity of summoning medical personnel to testify at the trial of most of such

cases (as is necessary when a blood test is administered")); Testimony of [then] Lieutenant Governor J. Joseph Curran, Jr., before the Senate Constitutional and Public Law Committee (Senate Bill 513) and the House Judiciary Committee (House Bill 885)(stating that blood tests are "sometimes difficult to accomplish in certain field situations" and that blood tests cause delay); Maryland Department of Transportation, Position on Proposed Legislation on Senate Bill 513 (February 23, 1983).

Furthermore, the bill file contains the NATIONAL SAFETY COUNCIL, ALCOHOL AND THE IMPAIRED DRIVER—A MANUAL ON THE MEDICOLEGAL ASPECTS OF CHEMICAL TESTS FOR INTOXICATION WITH SUPPLEMENT ON BREATH/ALCOHOL TESTS 94–97 (Chicago 1976) (MANUAL). The MANUAL sets forth the many advantages to using the breath test, including: (1) While a blood test requires laboratory facilities and thus takes longer to complete, a breath test "is obtainable within a few minutes"; (2) A breath test "accurately reflects the actual pulmonary arterial blood-alcohol level at the time of the test"; (3) Breath test specimens avoid "evidentiary safeguard problems"; (4) Breath tests require less technical training to administer; (5) The facilities required to administer a breath test are minimal; and (6) Subjects usually have less objection to the collection of breath. MANUAL, at 94–95. Furthermore, the disadvantages of breath tests listed in the MANUAL are all diminished by specific provisions of Maryland's drunk driving laws. For example, the MANUAL states that some cooperation is necessary to administer the test. MANUAL, at 96. Maryland's statute only permits the breath test to be administered with the licensee's consent. § 10–309(a). The MANUAL also states that the test is not applicable to an unconscious person. MANUAL, at 96. Maryland's statute requiring a breath test has a specific exemption where the licensee is unconscious. § 10–305(a)(1). The MANUAL also says that a breath specimen is difficult to preserve for later independent analysis, MANUAL, at 95, so Maryland's statute specifically provides for the

licensee to obtain an independent test at the licensee's discretion. § 10–304(e).

Moreover, it seems likely that the legislature recognized that a blood test is more invasive than a breath test. While the administration of a blood test to determine alcohol concentration is not constitutionally impermissible, *see, e.g., Schmerber v. California,* 384 U.S. 757, 771–72, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908, 920 (1966); *State v. Moon,* 291 Md. 463, 473, 436 A.2d 420, 425 (1981), the Supreme Court has recognized the invasiveness of administering a blood test. Such blood tests implicate the Fourth Amendment. In *Schmerber,* the Supreme Court upheld the constitutionality of using blood tests without a warrant to test blood-alcohol level. 384 U.S. at 771–72, 86 S.Ct. at 1836, 16 L.Ed.2d at 920. The Supreme Court, however, specifically limited that holding to the facts of the case. *Id.* There, the driver had refused to consent, but the Court upheld the admission of the test results stating that the driver was "not one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing, such as [a] '[B]reathalyzer.'" *Schmerber,* 384 U.S. at 771, 86 S.Ct. at 1836, 16 L.Ed.2d at 920. The Court emphasized: "It bears repeating ... that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits ... intrusions under other conditions." *Schmerber,* 384 U.S. at 772, 86 S.Ct. at 1836, 16 L.Ed.2d at 920.

*Hyle,* 348 Md. at 151–55, 702 A.2d at 764–65 (some internal citations omitted)(footnote omitted) (some alterations in original).[10] As indicated, *supra,* the position of the dissent, if its

---

**10.** This Court has had occasion to further discuss the legislative history of sections 10–302 through 10–309. *See State v. Loscomb,* 291 Md. 424, 435 A.2d 764 (1981) (holding that results of blood test were inadmissi-

practical consequences are considered, might, and, in my view, probably would, result in significant reduction in the use of Breathalyzer results and a significant increase in the use of blood testing. That would be contrary to what this Court has previously held to be the intent of the Legislature.

The legislative history behind section 10–305 and related statutes clearly reflects Maryland's preference for a breath test over a blood test when determining alcohol concentration in an alleged alcohol—influenced or intoxicated driver. *See Hyle, supra.* A breath test has been mandated as the test that a law enforcement officer *shall* employ except in three specific circumstances, none of which, as I believe and have indicated, exist in the case *sub judice.*

Petitioner also argues that the police had an affirmative statutory obligation to preserve the scientific evidence of her blood alcohol content. There is no indication that the police officers involved did not preserve the evidence in this case. In fact, the State sought to have the results admitted, but the trial court sustained petitioner's objection to its admissibility. The police collected evidence of petitioner's blood alcohol content several times with the intoximeter but percentage readings were not produced. The police preserved the inconclusive results, "0.173 percent," "insufficient breath" and "interfering substance," and sought to have them admitted. Appellant objected and they were not admitted. No where in the statutory scheme does it say that the results of the test need to be stated in percentages in order for the test to be complete. The results may be inadmissible (as they were ruled to be in this case), but the testing process is complete.

Petitioner asserts that the State has failed to perform an affirmative statutory duty at the cost of petitioner's rights and argues that because the police did not produce a test of her blood, when she says she requested it, she was denied due process of law. I again note that the police, under the

---

ble when officer had blood test administered without the consent of the driver).

circumstances of this case, had no mandatory duty to provide a blood test. Furthermore, as this Court said in *Werkheiser,* 299 Md. at 537–38, 474 A.2d at 902–03:

A due process issue was considered by the Supreme Court of Colorado in *People v. Culp,* 189 Colo. 76, 537 P.2d 746 (1975) (en banc). The court stated:

"We also hold that due process principles do not require the state to offer a chemical test to the defendant. *State v. Reyna,* [92 Idaho 669, 448 P.2d 762 (1968) ]; *City of Kettering v. Baker,* 40 Ohio App.2d 566, 321 N.E.2d 618 (1974). We quote from *Reyna, supra,* and adopt the Idaho Supreme Court's disposition of this argument:

'. . . the right to due process of law does not include the right to be given a blood test in all circumstances.

To hold otherwise would be to transform the accused's right to due process into a power to compel the State to gather in the accused's behalf what might be exculpatory evidence. In this case, the State produced testimonial evidence of intoxication, but it had no obligation to obtain for appellant what he speculates might have been more scientific evidence of sobriety. The State may not suppress evidence, but it need not gather evidence for the accused.' "

*Culp,* 537 P.2d at 748 [quoting *Reyna,* 448 P.2d at 767].

We agree with this reasoning and find the situation analogous to other forms of evidence which the state may not have available for trial. For instance, in *Eley v. State,* 288 Md. 548, 419 A.2d 384 (1980), we were confronted with a criminal case where there was no fingerprint evidence with respect to the escape vehicle. Judge Cole stated for the Court:

"While it is not incumbent upon the State to produce fingerprint evidence to prove guilt, nevertheless, where a better method of identification may be available and the State offers no explanation whatsoever for its failure to come forward with such evidence, it is not unreasonable

to allow the defendant to call attention to its failure to do so."

*Id.* at 554, 419 A.2d at 387. In *Spell v. State,* 49 Md.App. 323, 431 A.2d 752 (1981), the Court of Special Appeals applied our ruling in *Eley* to permit comment by defense counsel that the state had deviated from routine and reliable methods of identification—in that instance, a line-up. [Alterations in original.]

When scientific evidence of petitioner's blood alcohol content is collected, there may be a duty to preserve it, however, as I understand the statutory scheme applicable in this case, there is no affirmative duty that scientific and admissible evidence of petitioner's blood alcohol content actually be obtained. The preservation of evidence standard is the same, regardless of whether the tests produce percentage results or are inconclusive in that regard. Merely because the tests are inconclusive does not, as I see it, then create a duty on the State to keep gathering additional scientific evidence until admissible scientific evidence is obtained.

As the Court said in *State v. Moon,* 291 Md. 463, 477, 436 A.2d 420, 427 (1981), the relevant statutes have not been enacted for the protection of the accused rather they are "concerned with the protection of the public." *See Major v. State,* 31 Md.App. 590, 591, 358 A.2d 609, 610 ("The General Assembly, mindful of the safety of persons in this State and heedful of the general welfare, has acted to deter a person who has consumed alcohol from driving a vehicle on the highways of Maryland."), *cert. denied sub nom., Flanagan v. State,* 278 Md. 722 (1976). In the case *sub judice,* there has been no denial of due process because tests were taken and the results were available.

The position I ascribe to is supported, I believe, by another statute in this legislative scheme. Section 10–308(a) of the Courts and Judicial Proceedings Article provides in respect to tests:

The evidence of the analysis does not limit the introduction of other evidence bearing upon whether the defendant

was intoxicated or whether the defendant was driving while under the influence of alcohol, while so far under the influence of any drug, any combination of drugs, or a combination of one or more drugs and alcohol that the person cannot drive a vehicle safely, or while under the influence of a controlled dangerous substance.

The Court of Special Appeals quoted section 10–308(a) in *Major*, 31 Md.App. at 595–96, 358 A.2d at 612–13, when it provided:

In the light of these provisions, we are convinced that the Legislature did not intend that evidence of the alcoholic content of a person's body, obtained through the prescribed chemical tests for intoxication, be a prerequisite of conviction for violation of the crime created by Art. 66 ½, § 11–902.[11] Had we any doubt, it would be removed by Courts Art. § 10–308.... If evidence of the chemical analysis does not limit the introduction of other evidence bearing upon whether the defendant was in an intoxicated condition, under the influence of intoxicating liquor, or his driving ability was impaired by the consumption of alcohol, patently, reasonably and logically, such other evidence may be introduced when there is no evidence of a chemical analysis. To adopt a contrary view would be unreasonable and inconsistent with common sense. See *Height v. State*, 225 Md. 251, 259[, 170 A.2d 212] (1961); *Nooe v. City of Baltimore*, 28 Md.App. 348, 355[, 345 A.2d 134] (1975). A person accused of committing the offenses proscribed by Code, Art. 66 ½, § 11–902 could completely thwart any prosecution by refusing to submit to one of the prescribed tests.

We conclude that a person may be convicted of driving a vehicle while in an intoxicated condition or while his driving ability was impaired by the consumption of alcohol in the absence of evidence establishing the alcoholic content of his

---

**11.** Maryland Code (1957, 1970 Repl.Vol.), Article 66 ½, section 11–902 is a precursor to current section 21–902 of the Transportation Article. Section 11–902 made it unlawful to drive while intoxicated, impaired by alcohol, or under the influence of drugs.

body according to chemical analysis made pursuant to tests prescribed by statute. To put it another way, the introduction of evidence with respect to the alcoholic content in the accused's body, as shown upon chemical analysis through tests pursuant to Courts Art. §§ 10–302 through 10–309, is not a prerequisite to a conviction of the crimes proscribed by Art. 66 ½, § 11–902(a) and (b). Conviction may be had on any competent evidence legally sufficient to establish the *corpus delicti* of the crimes and the criminal agency of the accused.

I agree. Alcohol concentration tests are not a prerequisite to a conviction in the first instance. In the case *sub judice,* petitioner was arrested, the tests were conducted, and she was convicted, not on the inconclusive breath tests, but on the testimony of Officer Catherman concerning evidence of petitioner's demeanor during the traffic stop.

The results of these tests were not admissible (although the State sought to introduce them)—that does not make them missing. Nor does it make the machine, operating as it was designed to operate, inoperable or unavailable. The results of the machine's operation were available. Petitioner objected to their admission. In my view, the State was burdened neither with the duty of continuing breath tests until percentage results were gained nor with the duty to conduct a blood test. If it were so burdened, defendants, as the Court mentioned in *Hyle,* 348 Md. at 152–53, 702 A.2d at 764–65, and as I indicate earlier in this concurrence, could completely forestall the obtaining of percentage reading results by providing less than full cooperation during the testing period, thus, thwarting a conviction in spite of any other evidence that might be available. This risk is especially high when the first of several tests indicates a high level of intoxication as in the present case. Experienced persons, or persons educated in the manner in which the machines work, could thwart the operation of the machine and then claim the right to a presumption or a court mandated inference, via an instruction, against intoxication.

Generally, section 16–205.1 of the Transportation Article does impose a mandatory duty upon officers to obtain a test for alcohol concentration when a detained person consents to the taking of the test. I would reach the first issue presented and hold that such a test need not always produce a result based upon percentages. The fact that the results from the breath tests given to petitioner by the police officers did not provide admissible evidence of intoxication or sobriety, in my view, does not then impose upon the State the additional duty of administering a blood test for alcohol concentration. Simply stated, the results of the Breathalyzer tests are not missing. They may be upon proper objection, not admissible.

In circumstances such as those present in the case at bar, even if a duty to procure a blood test existed, the appropriate remedy, as the majority opinion holds, would be to allow defense counsel to argue an inference that had a blood test been administered, its results would have been favorable to petitioner. As the Court's opinion points out, defense counsel was afforded the opportunity during closing to argue for an inference, that had a blood test been administered its results would have been favorable to petitioner. I agree with the Court's opinion that petitioner was entitled to nothing more.

BELL, Chief Judge, dissenting.

Assuming that Maryland Code (1977, 1999 Repl.Vol., 2000 Cum.Supp.), § 16–205.1 of the Transportation Article generally imposes "a mandatory duty upon officers to obtain a test for alcohol concentration when a detained person consents to the taking of [the] test," the majority holds nevertheless that the appropriate remedy to cure the error of failing to do so is, rather than a missing evidence instruction given by the court, solely to allow counsel to argue to the fact finder that, had the blood test been given, it would have produced a result favorable to the petitioner. 363 Md. 357, 360, 768 A.2d 688, 689 (2001). The majority thus affirms the judgment of the Circuit Court for Howard County and, therefore, the petitioner's conviction. The concurring opinion embraces this holding and goes one step further, opining that the mandated test itself

need not produce a percentage reading, *i.e.*, one that is evidence of intoxication or sobriety. *Id.* at 377, 768 A.2d at 699 (Cathell, J., concurring). Consequently, the concurring opinion, reasoning that inadmissible results are not missing results, rejects the argument, proffered by the petitioner, Mariellen Lowry, that the failure of the police to obtain an admissible percentage reading in her case required the State then to administer a blood test for alcohol concentration. *Id.* at 377, 768 A.2d at 699. I disagree with both the holding of the majority opinion and with the reasoning of the concurrence.

Ordinarily, I would address the majority opinion and its contentions first and then those of the concurring opinion. In this case, however, logically, and for ease of reading, I will discuss the majority opinion and the concurring opinion in reverse order. Answering the concurring opinion allows for the development and explanation of the premise, *i.e.*, theory of the case, on which the jury instruction I contend is required to be given is built.

Though not compellable, *see* § 16–205.1(b)(1), any person who drives in this State and is stopped and detained under suspicion of driving under the influence or while intoxicated is deemed to have consented, subject to the provisions of Maryland Code (1974, 1998 Repl.Vol., 2000 Cum.Supp.), §§ 10–302—10–309 of the Courts and Judicial Proceedings Article, to take a test to determine alcohol concentration. § 16–205.1(a)(2). If the person consents, after advice of the consequences of refusal, § 16–205.1(b)(2)(iii), § 10–305 of the Courts Article prescribes the kind of test that will be given. It provides:

> "(a) The type of test administered to the defendant to determine alcohol concentration shall be the test of breath except that the test of blood shall be the type of test administered if:
>
> '(1) The defendant is unconscious or otherwise incapable of refusing take a test to determine alcohol concentration;

(2) Injuries to the defendant require removal of the defendant to a medical facility;  or

(3) The equipment for administering the test of breath is not available.'

"(b) The type of specimen obtained from the defendant for the purpose of a test or tests to determine drug or controlled dangerous substance content shall be a blood specimen.

"(c) Any person who is dead, unconscious, or otherwise in a condition rendering him incapable of test refusal shall be deemed not to have withdrawn consent."

Thus, the preferred test for alcohol concentration is the breath test and it will be given unless the defendant is unable to refuse to take a test by reason of unconsciousness or other condition, his or her injuries require that he or she be taken to a medical facility, or the equipment for administering the test is unavailable. Section 10–307(b)–(f) of the Courts Article addresses the effect of the intoxication test results:

"(b) If at the time of testing a person has an alcohol concentration of 0.05 or less, as determined by an analysis of the person's blood or breath, it shall be presumed that the defendant was not intoxicated and that the defendant was not driving while under the influence of alcohol.

"(c) If at the time of testing a person has an alcohol concentration of more than 0.05 but less than 0.07, as determined by an analysis of the person's blood or breath, this fact may not give rise to any presumption that the defendant was or was not intoxicated or that the defendant was or was not driving while under the influence of alcohol, but this fact may be considered with other competent evidence in determining the guilt or innocence of the defendant.

"(d) If at the time of testing a person has an alcohol concentration of at least 0.07 but less than 0.10, as determined by an analysis of the person's blood or breath, it shall be prima facie evidence that the defendant was driving while under the influence of alcohol.

"(e) If at the time of testing a person has an alcohol concentration of 0.02 or more, as determined by an analysis of the person's blood or breath, it shall be prima facie evidence that the defendant was driving with alcohol in the defendant's blood.

"(f) If at the time of testing a person has an alcohol concentration of 0.02 or more, as determined by an analysis of the person's blood or breath, it shall be prima facie evidence that a defendant was driving in violation of an alcohol restriction under § 16–113 of the Transportation Article." [1]

To be sure, therefore, test results showing a high blood alcohol content would have been extremely prejudicial to the petitioner, but it was likewise altogether possible that the opposite result could have resulted in a reading most favorable to her.

The petitioner agreed to take a test and breath tests were given. Unfortunately, the breathalyzer did not produce an analysis of the petitioner's breath admissible in evidence. Although the test of the first of the petitioner's breath samples produced an analysis that purported to measure the petitioner's blood alcohol, subsequent tests of her breath samples either failed to corroborate the first analysis or failed to produce any analysis at all. To be effective, two breath samples must be analyzed and a reading must be obtained as to both. This is required, as the officer administering the test testified, to ensure that the breathalyzer is in proper working order. A reading was obtained only as to the first of the petitioner's breath samples. The result from the second was

---

1. Maryland Code (1974, 1998 Repl.Vol., 2000 Cum.Supp.), § 10–308 makes clear that other evidence, in addition to breath tests, are admissible to prove a defendant's intoxication or being under the influence of alcohol:

"(a) The evidence of the analysis does not limit the introduction of other evidence bearing upon whether the defendant was intoxicated or whether the defendant was driving while under the influence of alcohol, while so far under the influence of any drug, any combination of drugs, or a combination of one or more drugs and alcohol that the person cannot drive a vehicle safely, or while under the influence of a controlled dangerous substance."

"insufficient breath" and from the next two, "interfering substance." Contrary to the concurring opinion's contention that the petitioner "failed to produce a sufficient quantity of breath to be tested," 363 Md. at 381, 768 A.2d at 701, the State has not contended, and the record does not reflect, that the petitioner sabotaged the test, or was in any way at fault for the breathalyzer's inability to register an admissible result.

Although aware that, at no time, did the breathalyzer produce results from two samples so as to be able to compare them for the purpose of insuring that the instrument was working properly, the concurring opinion rejects the petitioner's argument that the breathalyzer was unavailable and, therefore, that she was entitled to have a blood test, asserting, to the contrary, that the breathalyzer "performed as it was designed to do." *Id.* at 380, 768 A.2d at 700. More particularly, it says: "[t]he readings that the machine displayed were consistent with its programming and function—it merely was not providing percentage results as to the sobriety or intoxication of petitioner." *Id.* at 382, 768 A.2d at 701.

To emphasize the point that inadmissible results are contemplated, the concurring opinion recalls that the second sample tested, following a test producing a reading of 0.173, produced a reading of "insufficient breath,"and then quotes from the Regulations of the Toxicologist Post Mortem Examiners Commission State of Maryland Regarding Tests of Breath and Blood for Alcohol (October 1, 1995) at 15, as follows:

" 'The test sequence is now completed and the results are printed. If the subject fails to complete the required test sequence by either not providing sufficient breath samples as indicated by the instrument or failing to give samples when directed to do so by the Operator, then the test shall be considered incomplete and shall be recorded in the State of Maryland Alcohol Testing Log as a refusal.' "

*Id.* at 382–83, 768 A.2d at 701–02. The concurring opinion states that the petitioner did not produce sufficient breath to complete the test, thus, even though there is neither evidence

nor contention to support it, apparently blaming the petitioner for the failure of the machine to corroborate the first reading. It relies also on *Hyle v. Motor Vehicle Admin.*, 348 Md. 143, 702 A.2d 760 (1997).

The concurring opinion is simply wrong. Contrary to the concurring opinion's assertion that the instrument has not been shown to be operating other than properly, the results of the breathalyzer's operation with respect to the testing of the petitioner's breath for alcohol concentration are proof positive that the breathalyzer in this case was not "in proper working order." The purpose of a breathalyzer is to measure the alcohol content of a person's breath. See § 10–302 of the Courts Article, which provides:

"In a prosecution for a violation of a law concerning a person who is driving or attempting to drive a vehicle in violation of § 16–113, § 16–813, or § 21–902 of the Transportation Article, or in violation of Article 27, § 388, § 388A, or § 388B of the Code, a test of the person's breath or blood may be administered for the purpose of determining alcohol concentration and a test or tests of 1 specimen of the person's blood may be administered for the purpose of determining the drug or controlled dangerous substance content of the person's blood."

In *Borbon v. Motor Vehicle Admin.*, 345 Md. 267, 279, 691 A.2d 1328, 1334 (1997), we stated that "[t]he General Assembly's purpose for requiring approval of the test equipment was to gain some assurance that the equipment used would measure with reasonable accuracy the breath alcohol of licensees who were believed to have committed alcohol related driving violations." *See also* § 10–307(a)(1) ("In a proceeding in which a person is charged with a violation of Article 27, § 388, § 388A, or § 388B of the Code, or with driving or attempting to drive a vehicle in violation of § 16–113, § 16–813, or § 21–902 of the Transportation Article, the amount of alcohol in the person's breath or blood shown by analysis as provided in this subtitle is admissible in evidence and has the effect set forth in subsections (b) through (e) of this section.").

The breathalyzer is working properly, therefore, when it produces a percentage result that measures the defendant's breath alcohol concentration. When it does not produce such a result, it is not working properly. In this context, as the petitioner submits, " 'available' means 'capable of producing meaningful results from the breath of the defendant.' " In short, therefore, a machine that does not produce, or is incapable of producing, the results it was designed to produce serves no useful purpose and is, thereby, rendered unavailable for purposes of § 10–305. That is simply a matter of common sense and logic.

The logic is even more compelling when it is recalled that the General Assembly deemed alcohol concentration tests extremely important, so much so that it sought by the statutory scheme devised to "encourage[ ] drivers to take the test and, consequently, facilitate[ ] their prosecution." *Motor Vehicle Admin. v. Chamberlain*, 326 Md. 306, 313, 604 A.2d 919, 922 (1992), *citing Motor Vehicle Admin. v. Shrader*, 324 Md. 454, 464, 597 A.2d 939, 944 (1991). Additional support is provided by the fact that, in addition to refusal to take the test, the statute sanctions failing the test with a reading of 0.10 or better. *See* § 16–205.1(b).[2]

---

**2.** That section provides, as relevant:

"(b)(1) Except as provided in subsection (c) of this section, a person may not be compelled to take a test. However, the detaining officer shall advise the person that, on receipt of a sworn statement from the officer that the person was so charged and refused to take a test, or was tested and the result indicated an alcohol concentration of 0.10 or more, the Administration shall:

'(i) In the case of a person licensed under this title:

1. For a test result indicating an alcohol concentration of 0.10 or more at the time of testing:

A. For a first offense, suspend the driver's license for 45 days; or

B. For a second or subsequent offense, suspend the driver's license for 90 days; or

\* \* \* \*

"(2) Except as provided in subsection (c) of this section, if a police officer stops or detains any person who the police officer has reasonable grounds to believe is or has been driving or attempting to drive a motor vehicle while intoxicated, while under the influence of alcohol, while so far under the influence of any drug, any combination of

drugs, or a combination of one or more drugs and alcohol that the person could not drive a vehicle safely, while under the influence of a controlled dangerous substance, in violation of an alcohol restriction, or in violation of § 16–813 of this title, and who is not unconscious or otherwise incapable of refusing to take a test, the police officer shall:

'(i) Detain the person;

(ii) Request that the person permit a test to be taken; and

(iii) Advise the person of the administrative sanctions that shall be imposed for refusal to take the test, including ineligibility for modification of a suspension or issuance of a restrictive license under subsection (n)(1) or (2) of this section, and for test results indicating an alcohol concentration of 0.10 or more at the time of testing.'

"(3) If the person refuses to take the test or takes a test which results in an alcohol concentration of 0.10 or more at the time of testing, the police officer shall:

'(i) Confiscate the person's driver's license issued by this State;

(ii) Acting on behalf of the Administration, personally serve an order of suspension on the person;

(iii) Issue a temporary license to drive;

(iv) Inform the person that the temporary license allows the person to continue driving for 45 days if the person is licensed under this title;

(v) Inform the person that:

1. The person has a right to request, at that time or within 10 days, a hearing to show cause why the driver's license should not be suspended concerning the refusal to take the test or for test results indicating an alcohol concentration of 0.10 or more at the time of testing, and the hearing will be scheduled within 45 days; and

2. If a hearing request is not made at that time or within 10 days, but within 30 days the person requests a hearing, a hearing to show cause why the driver's license should not be suspended concerning the refusal to take the test or for test results indicating an alcohol concentration of 0.10 or more at the time of testing will be scheduled, but a request made after 10 days does not extend a temporary license issued by the police officer that allows the person to continue driving for 45 days;

(vi) Advise the person of the administrative sanctions that shall be imposed in the event of failure to request a hearing, failure to attend a requested hearing, or upon an adverse finding by the hearing officer; and

(vii) Within 72 hours after the issuance of the order of suspension, send any confiscated driver's license, copy of the suspension order, and a sworn statement to the Administration, that states:

1. The officer had reasonable grounds to believe that the person had been driving or attempting to drive a motor vehicle on a highway or on any private property that is used by the public in general in this State while intoxicated, while under the influence of alcohol, while so far under the influence of any drug, any combination of drugs, or a combination of one or more drugs and alcohol that the person could not drive a vehicle safely, while under the

As indicated, to be admissible, a first reading must be corroborated by a second reading. A result of "insufficient breath" does not corroborate a reading of 0.173, such that one would have confidence in the operation of the breathalyzer. Nor do two "interfering substances" readings suggest that the machine is working properly. When a machine designed to measure alcohol content of the breath requires corroboration and even though the defendant is cooperating and not sabotaging the test, the corroboration cannot be achieved, that machine is not working properly. That its instructions and operation contemplate those instances when the machine may not operate properly does not mean that those instances of improper operation are, or should be treated as, a normal occurrence. Indeed, following the concurring opinion's reasoning to its logical conclusion, a breathalyzer that gives some reading, even though the reading does not, consistent with its purpose, measure the alcohol content of the breath of the person being tested, is working properly and is therefore available; there never could be an inoperable machine. That is absurd.[3] Furthermore, it renders § 10–305(a)(3), the statutory allowance for a blood test, absolutely meaningless.

The passage from the Regulations of Toxicologists is not at all reflective of what occurred in this case. The situation addressed in the Regulations is one in which the defendant

---

influence of a controlled dangerous substance, in violation of an alcohol restriction, or in violation of § 16–813 of this title;

2. The person refused to take a test when requested by the police officer or the person submitted to the test which indicated an alcohol concentration of 0.10 or more at the time of testing; and

3. The person was fully advised of the administrative sanctions that shall be imposed, including the fact that a person who refuses to take the test is ineligible for modification of a suspension or issuance of a restrictive license under subsection (n)(1) or (2) of this section.' "

**3.** It is equally, or more, absurd if, as it may be construed, the concurring opinion is saying that mere physical presence of the machine is enough, whether or not it is operable or even capable of operating. As the petitioner points out, "[s]urely, even the State would not urge that an Intoximeter 3000, [physically] present but inoperative due to a power outage ... was 'available' within the meaning of the statute."

fails to cooperate and, in fact, sabotages the test.[4]  In that situation, there is no question of whether the test has been given properly or whether the machine is working properly; because of the defendant's actions, the test is treated as if it was refused.  By contrast, here the petitioner cooperated and the State does not even contend that she did anything to cause the machine to produce the results that it did. Certainly, there has not been a determination that the petitioner refused the test.[5]

Even in the case in which there is an allegation that the defendant refused to cooperate and, in fact, sabotaged the test, more than a bald allegation to that effect or a mere machine reading of "insufficient breath" is required to establish the fact.  In *Borbon, supra,* the issue was "whether a result of 'insufficient breath' reported by a breath alcohol testing device suffices, in and of itself, to prove that the motorist refused a breath test."  345 Md. at 269, 691 A.2d at 1329.  We held that it did not.  Noting, "at least theoretically, that a person does not violate an implied consent law if that person is unable to produce a sufficient breath specimen for testing purposes due to physical disability or other cause not involving the volition of the person being tested," *id.* at 278,

---

4.  The concurring opinion suggests that, if a blood test is mandated whenever a breathalyzer is inoperable, rather than simply not available physically, there would be provided an incentive for the defendant to be less than cooperative.  *See* 363 Md. 379, 768 A.2d 700 (2001).  It is precisely this concern that the passage quoted from the Toxicologist manual addresses and for which it provides a clear and decisive answer.  That is not, however, this case.

5.  Section III.C.3 of the Regulations of the Toxicologist Post Mortem Examiners Commission State of Maryland Regarding Tests of Breath and Blood for Alcohol (October 1, 1995) states in relevant part:
  "The instrument will only accept a proper deep lung sample.  If the sample is insufficient, the instrument automatically aborts the sample, goes into a purge cycle, then a blank cycle and requests another breath sample.  The instrument will allow 3 attempts, with 3 minutes per attempt; otherwise, it is an incomplete test and the instrument will discontinue any further testing."
  Thus, it is quite clear that there could not have been a refusal under the facts of this case.

691 A.2d at 1333–34 (citing R.G. Donaldson, Annotation, *Sufficiency of Showing of Physical Inability to Take Tests for Driving While Intoxicated to Justify Refusal,* 68 A.L.R.4th 776 (1989); Nichols § 20:29, at Chap. 20—Pages 94–97), we concluded:

> "In the instant matter the printout reporting insufficient breath does not indicate whether Borbon was unwilling or unable to produce the required volume of deep lung air. Absent any other evidence in the record bearing on the point, and, absent a shifting of the burden of proof by a statute or authorized regulation, the ordinary rule applies, i.e., the MVA, as the proponent of suspending Borbon's license, had the burden of establishing that there had been a refusal by conduct."

345 Md. at 279–80, 691 A.2d at 1334. We pointed out that in that case, there was no such other evidence, stating:

> "In the matter before us, the statements of the arresting officer and of the technician do not include any facts observed by them that tend to support the conclusion of a test refusal. For example, if Borbon had no apparent health problems, a statement to that effect might well have been enough to tip from equipoise and require Borbon to go forward with evidence."

*Id.* at 281, 691 A.2d at 1335. We declined, in short, to "confer on the machine the ALJ's function of determining whether the MVA has made out enough of a case of refusal to require the licensee to produce evidence." *Id.* at 283, 691 A.2d at 1336.

The concurring opinion's reliance on *Hyle* is also misplaced. There, the defendant, having agreed to take a breath test, refused to take a blood test when it was determined that, although the equipment was physically present and, therefore, available, there was no qualified technician available to administer the breath test. As a result, the defendant's license was suspended. We granted certiorari to "determine whether it is proper to suspend a licensee's driver's license for refusing to take a blood test for alcohol concentration pursuant to ... § 16–205.1(b)(1)(i)2.A, where the licensee agrees to take a

breath test and the apparatus for administering the test is available, but no qualified person is available to administer the breath test." 348 Md. at 145, 702 A.2d at 761. Construing "equipment" as used in § 10–305(a)(3), we reversed, holding that a qualified person is not encompassed within the definition of that term. *Id.* at 156, 702 A.2d at 766. No issue of the operability of the equipment—the issue in this case, was raised and, so, we did not address it. In fact, because there was no one present to operate the machine, we were not able to determine whether the machine would have produced an alcohol concentration reading. Thus, it is impossible to know what the result would have been if, as here, the equipment could not or, at least, did not, produce a result that measured the defendant's percentage of alcohol concentration. I submit that, in that event, a totally different case, with a potentially much closer result, would have been presented.

There is, however, a similarity between *Hyle* and this case—Hyle was not responsible for the condition that made administration of the breath test impossible. And it was not a case where circumstances not within the control of either of the parties prevented the test from being performed. As here, the responsibility for providing a machine, and one that operates properly, was the State's.

I conclude that the breathalyzer was inoperable and thus unavailable. Consequently, the petitioner's request for a blood test should have been honored. The question we must now face is, what is the remedy when it is not?

The majority rejects, as the remedy for breach, a jury instruction that the petitioner is entitled to the inference that, if the blood test had been conducted, the result would have been favorable to her. While it applies *Patterson v. State*, 356 Md. 677, 741 A.2d 1119 (1999), *id.* at 373, 768 A.2d at 697, it does so based on premises which, I have demonstrated, are false. The breath tests are inadmissible, they are the product of an improperly operating machine. Thus, the fact that the first reading indicated a high alcohol percentage concentration is meaningless without corroboration of the machine's proper

functioning, corroboration that has yet to be supplied. There is no evidence that the petitioner did anything but cooperate with the officer administering the test. In any event, had there been such evidence, the State's remedy was to declare a refusal, pursuant to the Regulations. That was not done here.

There is a difference between this case and *Patterson*. To be sure, the General Assembly has expressed a preference for a breath test to measure alcohol concentration. It has also recognized that, when the breath test equipment is unavailable, a blood test should be given. That is the situation with which we are presented in this case. Surely, the jury is entitled to be apprised of the situation, to be told that the State, pursuant to legislative mandate, should have tested the petitioner's breath, but did not due to the breathalyzer failing to produce a breath alcohol analysis and of the circumstances in which a blood test must be given instead.

Maryland Rule 4–325(c) provides in pertinent part: "[t]he court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding.... The court need not grant a requested instruction if the matter is fairly covered by instructions actually given." Thus, the general rule regarding instructions to the jury has two aspects: (1) the instruction must correctly state the law, and (2) that law must be applicable in light of the evidence before the jury. We have said that " '[a] litigant is entitled to have his theory of the case presented to the jury, but only if that theory of the case is a correct exposition of the law and there is testimony in the case which supports it.' " *Sergeant Co. v. Pickett*, 285 Md. 186, 194, 401 A.2d 651, 655 (1979), *quoting Levine v. Rendler*, 272 Md. 1, 13, 320 A.2d 258, 265 (1974); *Fowler v. Benton*, 245 Md. 540, 548–549, 226 A.2d 556, 562, *cert. denied*, 389 U.S. 851, 88 S.Ct. 42, 19 L.Ed.2d 119 (1967); *Dorough v. Lockman*, 224 Md. 168, 171, 167 A.2d 129, 131 (1961).

In my view, the evidence in this case supports the petitioner's theory of the case—the breathalyzer machine was inoperable and thus unavailable, giving rise to her right to a blood

test pursuant to § 10–305(a)(3). Moreover, I believe that the petitioner's requested instruction accurately stated the law.[6] The court should have, at the petitioner's request, so instructed the jury. The failure to do so, even though allowing the petitioner to argue the matter, is tantamount to affording her no remedy at all, and may go so far as to penalize the petitioner for events beyond her control.

In Maryland, arguments of counsel are not evidence, a fact of which juries regularly are reminded by pointed jury instructions to that effect. On the other hand, it is at least as well settled in this State that the focal point—the most important personality—in a jury trial is the trial judge, to whom the jury more likely than not will defer. *See State v.*

---

**6.** The petitioner requested an instruction as follows:

"When a person is detained on suspicion of driving while under the influence of alcohol, Maryland law places a mandatory duty upon the detaining officer to request the person submit to a test to determine alcohol concentration. This person can agree to submit to a test or refuse. (*Transportation Article* § 16–205.1). When a person consents to the administration of a test to determine alcohol concentration, Maryland law requires that the test to be administered shall be a test of breath unless the person is unconscious or otherwise incapable of refusing to take a test to determine alcohol concentration, or the person has injuries which require their removal to a medical facility, or the equipment to administer the breath test is unavailable. Under those circumstances Maryland law provides that a blood test shall be administered. (Courts & Judicial Proceedings § 10–305).

"Maryland law places a mandatory duty upon a police officer to administer a test for alcohol concentration when a person consents to such a test. If the officer fails to comply with that statutory duty the courts in this state have held the person arrested is entitled to an inference at trial that had the test been administered, the results of that test would have been favorable to that person. ([*State v. Werkheiser*], 299 Md. 529, 474 A.2d 898 (19[8]4))."

The second paragraph of the requested instruction addresses the proper inference to be drawn from the failure of the State to provide the petitioner with a blood test. Thus, under *Patterson v. State,* 356 Md. 677, 741 A.2d 1119 (1999), it might go too far. No matter, that portion of the instruction that presented the petitioner's theory of the case and informed the jury as to the applicable law should have been given. It is implicit in the petitioner's theory that the breathalyzer, by being inoperable, was unavailable. At the very least, it seems to me, the jury was entitled to consider in its deliberations whether the breathalyzer was in fact operable. It could not do so, obviously, unless it was apprised of the issue.

*Hutchinson,* 287 Md. 198, 206, 411 A.2d 1035, 1040 (1980) ("The trial judge is the central figure at trial, having the chief responsibility of steering the jury through the maze of evidence. In such role, the trial judge may influence the jury by the inflection of his voice, his words, his conduct and his assessment of the evidence, if known."). Consequently, it is axiomatic that the jury will pay greater attention to what the trial judge instructs than to any of the arguments a defendant's counsel might make. It is not surprising, therefore, that this Court has held that arguments of counsel cannot effectively substitute for instructions by the court. *Williams v. State,* 322 Md. 35, 47, 585 A.2d 209, 215 (1991) (quoting *Taylor v. Kentucky,* 436 U.S. 478, 488–89, 98 S.Ct. 1930, 1936, 56 L.Ed.2d 468, 477 (1978)). *See also Simmons v. South Carolina,* 512 U.S. 154, 173, 114 S.Ct. 2187, 2198–99, 129 L.Ed.2d 133, 141 (1994) (Souter and Stevens, JJ, concurring) (quoting *Boyde v. California,* 494 U.S. 370, 384, 110 S.Ct. 1190, 1200, 108 L.Ed.2d 316, 331); *Johnson v. State,* 325 Md. 511, 519, 601 A.2d 1093, 1096–97 (1992).

I dissent.