Motor Vehicle Administration v. Jeffrey Thomas Gonce, No. 38, September Term, 2015

**MD. CODE ANN., TRANSP. (1977, 2012 REPL. VOL., 2015 SUPP.) § 16-205.1 – IMPLIED CONSENT, ADMINISTRATIVE PER SE LAW – AUTOMATIC DRIVER'S LICENSE SUSPENSION FOR REFUSAL TO TAKE TEST** – Court of Appeals held that, under Md. Code Ann., Transp. (1977, 2012 Repl. Vol., 2015 Supp.) ("TR") § 16-205.1(b)(2) and (3), driver is subject to automatic license suspension for refusal to take drug test where driver has taken alcohol concentration test and law enforcement officer has reasonable grounds to believe that driver was driving while impaired by drugs; in other words, under TR § 16-205.1(b)(2) and (3), law enforcement officer with reasonable grounds to suspect impairment may request that driver take both alcohol concentration test and drug test, and driver is subject to automatic license suspension for refusal to take second test.

IN THE COURT OF APPEALS

OF MARYLAND

No. 38

September Term, 2015

_____

MOTOR VEHICLE ADMINISTRATION

v.

JEFFREY THOMAS GONCE

_____

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Jr., Glenn T. (Retired,
Specially Assigned),

JJ.

_____

Opinion by Watts, J.

_____

Filed: January 22, 2016

In this case, we interpret Md. Code Ann., Transp. (1977, 2012 Repl. Vol., 2015 Supp.) ("TR") § 16-205.1,[1] commonly known as the "implied consent, administrative per se law," which provides a basis for the automatic suspension of the licenses of drivers who refuse to submit to testing for alcohol and drugs. Motor Vehicle Admin. v. Deering, 438 Md. 611, 615, 92 A.3d 495, 498 (2014). In Deering, id. at 612-13, 92 A.3d at 496-97, this Court explained the labels "implied consent" and "administrative per se" as follows:

> [TR § 16-205.1] incorporates "implied consent" in that [TR § 16-205.1] provides that any individual who drives a vehicle in Maryland is deemed to have consented to take a chemical test—usually, a breath test—to measure [] alcohol concentration, if stopped by a [law enforcement] officer with reasonable grounds to believe that the person has been driving under the influence of alcohol. Despite [TR § 16-205.1]'s declaration of implied consent by all drivers, [TR § 16-205.1] recognizes that a driver detained by a[ law enforcement] officer may refuse to take the [] test. But the time for making that decision is limited—[] alcohol concentration is transient[,] and any test must be conducted within two hours of the stop.

> The phrase "administrative per se" refers to the administrative consequences of a refusal to take the [] test, or of test results that reveal that the driver has a[n] alcohol concentration above certain levels (regardless of whether the driver otherwise appears to be impaired). In both cases, [TR § 16-205.1] provides for an automatic suspension of the driver's license for specified periods. The license suspension is an administrative sanction that is distinct from any criminal prosecution of the driver that might also ensue.

> Under [TR § 16-205.1], a detained driver thus has a choice to make—a choice with legal consequences. On the one hand, refusing the test carries a sure suspension; on the other, taking the test may result in no sanction at all[,] or in a significant suspension plus an increased potential for criminal

---

[1]The events that gave rise to this case occurred on June 29, 2014. Since then, three amendments to Md. Code Ann., Transp. § 16-205.1 have become effective. None of the three amendments, however, affects the issues in this case; indeed, the relevant parts of Md. Code Ann., Transp. § 16-205.1, which we quote below, have remained the same since June 29, 2014. Thus, for clarity, we refer to TR § 16-205.1—the statute's current version—in connection with the issue of statutory interpretation in this case. When referring to TR § 16-205.1's predecessors, we specify the Replacement Volume and Supplement, if any.

prosecution, depending on the test result.

Here, we decide the following question: Under TR § 16-205.1(b)(2) and (3), is a driver subject to an automatic license suspension for a refusal to take a drug test where the driver has taken an alcohol concentration test and a law enforcement officer has reasonable grounds to believe that the driver was driving while impaired by drugs? TR § 16-205.1's plain language, purpose, and legislative history lead us to the inescapable conclusion that the answer to this question is "yes"; under TR § 16-205.1(b)(2) and (3), a law enforcement officer with reasonable grounds to suspect impairment may request that a driver take both an alcohol concentration test and a drug test, and the driver is subject to an automatic license suspension for a refusal to take the second test.

**BACKGROUND**

On June 29, 2014, Trooper G. Stambaugh ("Trooper Stambaugh")[2] of the Maryland State Police issued to Jeffrey Thomas Gonce ("Gonce"), Respondent, an "Officer's Certification and Order of Suspension" that contained the following facts, which we summarize. At 5:00 p.m. on June 29, 2014, Gonce was driving west on U.S. Route 50 near the intersection with Castle Marina Road in Queen Anne's County. Trooper Stambaugh stopped Gonce for failure to securely fasten a registration plate. Upon seeing Gonce, Trooper Stambaugh observed what he believed to be indications of impairment, and, thus, administered the three-part Standardized Field Sobriety Test.[3] The "horizontal gaze

---

[2]The record does not reveal Trooper Stambaugh's first name.
[3]In Lowry v. State, 363 Md. 357, 362 n.6, 768 A.2d 688, 690 n.6 (2001), this Court summarized the three-part Standardized Field Sobriety Test as follows:

The horizontal gaze nystagmus test is an evaluation of the natural moving of the human eye as it follows a horizontally moving point of reference. The presence of alcohol in the body causes the eyes to take on a jerking movement. The walk and turn test requires a person to walk toe-to-heel on a straight line for approximately nine to ten steps. The one leg stand test requires a person to stand on one leg and count out loud for approximately five to ten seconds.

This Court quoted the above language in Motor Vehicle Admin. v. Illiano, 390 Md. 265, 269 n.6, 888 A.2d 329, 332 n.6 (2005), but has not quoted it since.

In 2013, the International Association of Chiefs of Police and the National Highway Traffic Safety Administration published a manual on the three-part Standardized Field Sobriety Test. See DWI Detection and Standardized Field Sobriety Testing (May 2013), https://www.isp.state.il.us/docs/2013dwisfst.pdf [https://perma.cc/UYX8-A958]. In an article dated 2013, FindLaw, a part of Thomson Reuters, summarized the three-part Standardized Field Sobriety Test as follows:

The [three-part] Standardized Field Sobriety Test [] endorsed by the National Highway Traffic and Safety Administration [] consists of the horizontal gaze nystagmus [], walk-and-turn[,] and one-leg stand []:

Horizontal Gaze Nystagmus: This term refers to the involuntary jerking of the eye that occurs naturally when the eye gazes to the side. But this jerking (or nystagmus) is exaggerated when someone is impaired by alcohol. Officers look for three indicators of impairment in each eye: inability to follow a moving object smoothly; distinct eye[-]jerking when eye is at maximum deviation; and eye-jerking within [forty-five] degrees of center.

Walk and Turn: The purpose of this test, determined to be easily done by most unimpaired people, tests the suspect's ability to complete tasks with divided attention. This is administered by requiring the suspect to take nine steps, heel-to-toe, along a straight line; turn on one foot; and then return in the same manner in the opposite direction.

One-Leg Stand: Suspects are asked to stand with one foot about six inches off the ground and count for [thirty] seconds. Swaying while balancing, using arms to balance, hopping[,] or putting the foot down indicate possible impairment.

nystagmus" test indicated zero out of a possible six clues of impairment. The "walk and turn" test indicated seven out of a possible eight clues of impairment. The "one-leg stand" test indicated three out of a possible four clues of impairment.

Trooper Stambaugh did not detect any odor of alcohol on Gonce's breath. Trooper Stambaugh asked to perform a preliminary breath test, to which Gonce consented. The preliminary breath test indicated a breath alcohol concentration of 0.003 grams of alcohol per 210 liters of breath. Trooper Stambaugh arrested Gonce and provided him with an Advice of Rights form, seeking permission pursuant to TR § 16-205.1 to perform an alcohol concentration test.[4]

Gonce agreed to take an alcohol concentration test. Specifically, at 5:30 p.m., Gonce checked a box next to the words "Yes - Agree to submit to an alcohol concentration test" and signed the Advice of Rights form. According to a "State of Maryland Notification to Defendant of Result of Test for Alcohol Concentration" (bolding and some capitalization omitted) and a printout from the equipment that tested breath alcohol concentration, between 6:07 p.m. and 6:13 p.m., Gonce took a breath alcohol concentration test, which indicated a breath alcohol concentration of 0.000 grams of alcohol per 210 liters of breath. In other words, Gonce passed the alcohol concentration test.

Knowing that Gonce had passed the breath alcohol concentration test, but having

---

FindLaw, Field Sobriety Tests, http://dui.findlaw.com/dui-arrests/field-sobriety-tests.html [http://perma.cc/WJV4-UVSL].
   [4]This concludes the summary of information from the Officer's Certification and Order of Suspension.

observed indications of Gonce's impairment, Trooper Stambaugh referred Gonce to Trooper First Class M. Miller ("Trooper Miller"),[5] a drug recognition expert. Trooper Miller completed a "Drug Recognition Expert's Certification Form." At 7:05 p.m., Trooper Miller evaluated Gonce. In the Drug Recognition Expert's Certification Form, Trooper Miller stated:

> I had reasonable grounds, which I have set forth below on this form, to believe that [Gonce] was driving . . . a motor vehicle while so far under the influence of any drug, any combination of drugs[,] or a combination of one or more drugs and alcohol, that [Gonce] could not drive a vehicle safely, or while under the influence of a Controlled Dangerous Substance.
>
> **REASONABLE GROUNDS:** [Horizontal gaze nystagmus], [Lack of convergence[6]], Droopy eyelids on the nod, Low raspy slow speech, Facial itching, Little reaction to light[, P]sychophysical impairment,[7] 0.00[0 Breath alcohol concentration], Slurred speech[,] Dry mouth, [C]onfused[.]

Trooper Miller asked Gonce to take a blood test for drugs or controlled dangerous substances, and Gonce refused to take the drug test.

Specifically, at 8:15 p.m., Gonce signed a second Advice of Rights form, on which he checked a box next to the words "No - Drug or [Controlled Dangerous Substances] test refused ([Drug Recognition Expert] must complete & submit [Drug Recognition Expert]

---

[5]The record does not reveal Trooper Miller's first name.

[6]"A subject lacks convergence if his [or her] eyes are unable to converge toward the bridge of his [or her] nose when a stimulus is moved inward." The International Drug Evaluation & Classification Program, The [Drug Recognition Experts] Protocol, http://www.decp.org/experts/12steps.htm [http://perma.cc/JQ3B-Q6WR].

[7]"Psychophysical tests are methods of assessing a suspect's mental and physical impairment. These tests focus on the abilities [that are] needed for safe driving: balance, coordination, information processing[,] and so on. . . . The most significant psychophysical test[]" is the three-part Standardized Field Sobriety Test. Justia, Drunk Driving (DUI/DWI), https://www.justia.com/criminal/drunk-driving-dui-dwi/docs/pre-arrest-screening.html [http://perma.cc/6BYG-Q77T].

Certification Form)[.]" Afterward, Trooper Stambaugh confiscated Gonce's driver's license, served an order of suspension on Gonce, and issued him a temporary driver's license.

Gonce requested an administrative hearing to show cause why the Motor Vehicle Administration ("the MVA"), Petitioner, should not suspend his driver's license. On September 23, 2014, an administrative law judge ("the ALJ") of the Office of Administrative Hearings conducted an administrative hearing. The ALJ admitted into evidence the Officer's Certification and Order of Suspension, the State of Maryland Notification to Defendant of Result of Test for Alcohol Concentration, the Drug Recognition Expert's Certification Form, the printout from the equipment that tested breath alcohol concentration, and both Advice of Rights forms.

At the administrative hearing, Gonce did not dispute the accuracy of any facts in any document, including Trooper Stambaugh's observations, Trooper Miller's observations, or the results of the three-part Standardized Field Sobriety Test.[8] Nor did Gonce dispute that Trooper Stambaugh had reasonable grounds to believe that he had been driving while under the influence of a drug or controlled dangerous substance. Instead, at the administrative hearing, Gonce asserted that, under TR § 16-205.1, he was not subject to an automatic license suspension for his refusal to take a drug test because he had taken and passed the alcohol concentration test. More broadly, Gonce argued that, under TR §

---

[8]Gonce's counsel objected to admission of the Drug Recognition Expert's Certification Form, but, after the ALJ asked whether Gonce's counsel "want[ed] to be heard on that[,]" Gonce's counsel responded: "No, Your Honor. Without argument." The ALJ overruled the objection.

16-205.1, a driver is subject to an automatic license suspension for a refusal to take either an alcohol concentration test or a drug test, but not for a refusal to take a second test after the driver took one test.  The ALJ rejected Gonce's contention, concluding that:

> The way [that TR § 16-205.1] is written, it's a test for alcohol concentration **and/or** a test for drug detection[, or] for [controlled dangerous substances]. Here, [Trooper Stambaugh] would not have had reasonable grounds to request [Gonce] to take a [controlled dangerous substances] test until after he was seen by [Trooper Miller].[9]

(Emphasis added).  The ALJ determined that Trooper Stambaugh had reasonable grounds to believe that Gonce had been driving  while under the influence of a controlled dangerous substance; concluded that Gonce violated TR § 16-205.1 by refusing to take the drug test; and ordered that Gonce's driver's license be suspended for one hundred and twenty days.

Gonce petitioned for judicial review.  On March 17, 2015, the Circuit Court for Baltimore County[10] ("the circuit court") conducted a hearing.  In an oral ruling, the circuit court reversed the ALJ's decision and concluded that, after Gonce passed the alcohol concentration test, Gonce "was not required . . . to submit to a blood test in order to avoid suspension."  In an order dated April 14, 2015, the circuit court reversed the ALJ's

---

[9]After the ALJ rejected Gonce's argument regarding TR § 16-205.1, Gonce's counsel stated: "That's all I have, Judge."  The ALJ responded: "Al[]right.  Did you want to be heard in any kind of mitigation?"  Gonce's counsel provided information about Gonce's background, including a back condition for which Gonce was "in pain management treatment[.]"  Gonce testified: "I'm tested on a regular basis with urinalysis to make sure that I'm taking the proper doses[,] as well as that I'm not taking any other foreign substances, including alcohol."

[10]Although Trooper Stambaugh arrested Gonce in Queen Anne's County, Gonce lives in Baltimore County; thus, the Circuit Court for Baltimore County was a proper venue. See Md. Code Ann., State Gov't (1984, 2014 Repl. Vol.) § 10-222(c) ("[A] petition for judicial review shall be filed with the circuit court for the county where any party resides[.]").

decision.

On April 24, 2015, the MVA filed in this Court a petition for a writ of *certiorari*, raising the following issue:

> Was a drunken or drugged driving suspect, who agreed to take an alcohol concentration test, which produced a test result of 0.00[0], subject to suspension under [TR] § 16-205.1, when he thereafter refused to submit to a [law enforcement] officer's request, based on reasonable grounds, to submit to a blood test for drugs or controlled dangerous substances?

On June 17, 2015, this Court granted the petition. See Motor Vehicle Admin. v. Gonce, 443 Md. 234, 116 A.3d 474 (2015).

## DISCUSSION

The MVA's position is straightforward; it contends that TR § 16-205.1(b)(2) and (3) authorize law enforcement officers with reasonable suspicion of impaired driving to request both an alcohol concentration test and a drug test. The MVA argues that, as used in TR § 16-205.1(b)(2) and (3), the word "test" means both an alcohol concentration test and a drug test. The MVA notes that TR § 16-205.1(a)(1)(iii)(3) defines the word "test" as "[b]oth: A. A test of a person's breath or a test of [one] specimen of a person's blood, to determine alcohol concentration; and B. A test or tests of [one] specimen of a person's blood to determine the drug or controlled dangerous substance content of the person's blood." (Paragraph breaks omitted). The MVA maintains that TR § 16-205.1's legislative history demonstrates that the General Assembly did not intend to limit the meaning of the word "test" to only one test.

Gonce responds that the ALJ erred in concluding that he was subject to an automatic license suspension for refusing to take the drug test. Gonce contends that, as used in TR §

- 8 -

16-205.1(b)(2) and (3), the word "test" means a single test. Under Gonce's interpretation of TR § 16-205.1(b)(2) and (3), a driver is subject to an automatic license suspension for a refusal to take either an alcohol concentration test or a drug test, but not for a refusal to take a second test after the driver has already taken one test. In support of this interpretation, Gonce relies on the circumstance that, in TR § 16-205.1(b)(2) and (3), the word "test" is singular, not plural.

A court defers to an administrative law judge's finding of fact where the record supports that finding of fact. See Motor Vehicle Admin. v. Shea, 415 Md. 1, 14, 997 A.2d 768, 775-76 (2010) ("A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record." (Citation omitted)). A court reviews with some deference an administrative law judge's interpretation of a statute that the relevant administrative agency administers. See Deering, 438 Md. at 622, 92 A.3d at 502 ("A reviewing court '. . . determine[s] if the administrative decision is premised upon an erroneous conclusion of law.' While this standard accords less deference to an agency's legal conclusions than to its fact findings, a reviewing court should give weight to the administrative agency's interpretation and application of the statute that the agency administers." (Quoting Shea, 415 Md. at 14-15, 997 A.2d at 775-76)).

In interpreting a statute, a court first considers the statute's language, which the court applies where the statute's language "is unambiguous and clearly consistent with the statute's apparent purpose[.]" Lark v. Montgomery Hospice, Inc., 414 Md. 215, 227, 994 A.2d 968, 975 (2010) (citation omitted).

We begin by examining the relevant provisions of TR § 16-205.1, "[t]he implied

consent, administrative per se law[.]" <u>Deering</u>, 438 Md. at 615, 92 A.3d at 498. TR § 16-205.1(a)(2) provides for "implied consent" as follows:

> Any person who drives or attempts to drive a motor vehicle on a highway or on any private property that is used by the public in general in this State is deemed to have consented, subject to the provisions of [Md. Code Ann., Cts. & Jud. Proc. (1973, 2013 Repl. Vol.) ("CJP")] §§ 10-302 through 10-309,[11] to take **a test** if the person should be detained on suspicion of driving or attempting to drive while under the influence of alcohol, while impaired by alcohol, while so far impaired by any drug, any combination of drugs, or a combination of one or more drugs and alcohol that the person could not drive a vehicle safely, while impaired by a controlled dangerous substance, in violation of an alcohol restriction, or in violation of [TR] § 16-813 [(Driving Commercial Motor Vehicle with Alcohol Concentration in Blood or Breath Prohibited)].

(Emphasis added).

> TR § 16-205.1(b)(2) directs law enforcement officers as follows:

> Except as provided in [TR § 16-205.1(c)], if a [law enforcement] officer stops or detains any person who the [law enforcement] officer has reasonable grounds to believe is or has been driving or attempting to drive a motor vehicle while under the influence of alcohol, while impaired by alcohol, while so far impaired by any drug, any combination of drugs, or a combination of one or more drugs and alcohol that the person could not drive a vehicle safely, while impaired by a controlled dangerous substance, in violation of an alcohol restriction, or in violation of [TR] § 16-813 [(Driving Commercial Motor Vehicle with Alcohol Concentration in Blood or Breath Prohibited)], and who is not unconscious or otherwise incapable of refusing to take **a test**, the [law enforcement] officer shall[, among other things]: (i) Detain the person; [and] (ii) Request that the person permit **a test** to be taken[.12]

---

[11]CJP §§ 10-302 through 10-309 govern both the administration of alcohol concentration tests and drug tests and the admissibility of the results of those tests. No statute in CJP §§ 10-302 through 10-309 is at issue in this case.

[12]TR § 16-205.1(b)(2)(iii), (iv), and (v) require the law enforcement officer to "[a]dvise the person of the administrative sanctions" and "additional criminal penalties" that will occur if the person either fails or refuses to take the test.

- 10 -

(Emphasis added) (paragraph breaks omitted).  "If the person refuses to take **the test** . . . , the [law enforcement] officer shall[, among other things]: (i) Confiscate the person's driver's license issued by this State; (ii) Acting on behalf of the [MVA], personally serve an order of suspension on the person; [and] (iii) Issue a temporary license to drive[.]"  TR § 16-205.1(b)(3) (emphasis added) (paragraph breaks omitted).[13]

TR § 16-205.1(c)(1) directs law enforcement officers as follows:

If a person is involved in a motor vehicle accident that results in the death of, or a life[-]threatening injury to, another person[,] and the person is detained by a [law enforcement] officer who has reasonable grounds to believe that the person has been driving or attempting to drive while under the influence of alcohol, while impaired by alcohol, while so far impaired by any drug, any combination of drugs, or a combination of one or more drugs and alcohol that the person could not drive a vehicle safely, while impaired by a controlled dangerous substance, or in violation of [TR] § 16-813 [(Driving Commercial Motor Vehicle with Alcohol Concentration in Blood or Breath Prohibited)], the person shall be required to submit, as directed by the [law enforcement] officer, to **a test** of: (i) The person's breath to determine alcohol concentration; (ii) One specimen of the person's blood, to determine alcohol concentration or to determine the drug or controlled dangerous substance content of the person's blood; or (iii) Both the person's breath under item (i) of this paragraph and one specimen of the person's blood under item (ii) of this paragraph.

(Emphasis added) (paragraph breaks omitted).

TR § 16-205.1(a)(1)(iii), part of the statute's definition subsection, defines the word "test" as follows:

"Test" means, unless the context requires otherwise: 1. A test of a person's

---

[13]Curiously, unlike for a test refusal or an alcohol concentration result of 0.08 or more, TR § 16-205.1(b) does not provide for an automatic license suspension for a positive drug test.  Rather, a different statute, TR § 16-205(c), allows the MVA to suspend a driver's license for up to sixty days upon a conviction for drugged driving.  This is of no consequence to the outcome in this case, however, because it is undisputed that Gonce refused to take the drug test (*i.e.*, Gonce did not take a drug test indicating a positive result).

- 11 -

breath or of [one] specimen of a person's blood to determine alcohol concentration; 2. A test or tests of [one] specimen of a person's blood to determine the drug or controlled dangerous substance content of the person's blood; or 3. **Both: A. A test of a person's breath or a test of [one] specimen of a person's blood, to determine alcohol concentration; and B. A test or tests of [one] specimen of a person's blood to determine the drug or controlled dangerous substance content of the person's blood**.

(Emphasis added) (paragraph breaks omitted).

The facts of this matter are undisputed. We must resolve a legal question of first impression—namely, whether, under TR § 16-205.1(b)(2) and (3), a driver is subject to an automatic license suspension for a refusal to take a drug test where the driver has taken (and passed) an alcohol concentration test and a law enforcement officer has reasonable grounds to believe that the driver was driving while impaired by drugs.

Based on TR § 16-205.1's plain language, we conclude that a driver may be asked to submit to both an alcohol concentration test and a drug test, and the driver cannot have an automatic license suspension overturned on the basis that TR § 16-205.1 permits a law enforcement officer to request only one test. By its plain language, TR § 16-205.1 gives law enforcement officers the authority to request that a person submit to a blood test for drugs or controlled dangerous substances and an alcohol concentration test, whether through breath or blood. TR § 16-205.1's plain language does not expressly limit law enforcement officers to only one test; *i.e.*, TR § 16-205.1 does not state that law enforcement officers must elect which test to request or that only one test is to be permitted. Stated otherwise, TR § 16-205.1 authorizes law enforcement officers to request an alcohol concentration test and a drug test, without any explicit language indicating that the tests are mutually exclusive.

- 12 -

To the contrary, as used in TR § 16-205.1(b)(2) and (3), the word "test" includes the plural of the word—*i.e.* "tests"—and means both an alcohol concentration test and a drug test. TR § 16-205.1(a)(1)(iii)(3) specifically defines the word "test" as "**[b]oth**: A. A test of a person's breath or a test of [one] specimen of a person's blood, to determine alcohol concentration; **and** B. A test or tests of [one] specimen of a person's blood to determine the drug or controlled dangerous substance content of the person's blood." (Emphasis added). TR § 16-205.1(a)(1)(iii)(3) unambiguously establishes that, as used in TR § 16-205.1(b)(2) and (3), the word "test" does not mean only one test. Thus, under TR § 16-205.1(b)(2) and (3), a law enforcement officer with reasonable grounds to suspect impairment may request that a driver take both an alcohol concentration test and a drug test—*i.e.*, the law enforcement officer is not limited to requesting either an alcohol concentration test or a drug test—and the driver is subject to an automatic license suspension for a refusal to take both tests.

Our conclusion is based not only on TR § 16-205.1(a)(1)(iii)(3)'s plain language, but also on Md. Code Ann., Gen. Prov. (2014) ("GP") § 1-202, which is part of the subtitle "Interpretation of Code Provisions." GP § 1-202 states in its entirety: "The singular includes the plural and the plural includes the singular."

This Court has previously used GP § 1-202's predecessors for the purpose of statutory interpretation. In Gatewood v. State, 244 Md. 609, 618, 224 A.2d 677, 683 (1966), in determining whether the singular version of a word also included its plural, this Court relied on GP § 1-202's immediate predecessor, Md. Code Ann., Art. I ("Art. I"), § 8, which stated: "The singular always includes the plural, and vice versa, except where

such construction would be unreasonable." In <u>Gatewood</u>, <u>id.</u> at 616, 224 A.2d at 682, a defendant was convicted of a lottery-related crime for the third time; one statute provided that the maximum sentence for a person's first conviction for a lottery-related crime was one year, and another statute stated: "If any person shall be a second time convicted of [a lottery-related crime], he [or she] shall on conviction be confined in the penitentiary not less than two nor more than five years[.]" (Citations and internal quotation marks omitted). A trial court sentenced the defendant to four years of imprisonment. <u>See id.</u> at 616-17, 224 A.2d at 682. On appeal, the defendant contended that he could not be sentenced to more than one year of imprisonment because the statute that included the phrase "a second time convicted" did not apply to a person's third conviction. <u>See id.</u> at 617, 224 A.2d at 682. This Court rejected the defendant's contention, stating: "Under [Art. I, § 8], the word 'time' may properly be taken as meaning 'time or times.'" <u>Id.</u> at 618, 224 A.2d at 683.

Similarly, in <u>Wheeler v. Rhoten</u>, 144 Md. 10, 12, 123 A. 572, 573 (1923), this Court relied on Art. I, § 8's identical predecessor, Art. I, § 7. In <u>Wheeler</u>, <u>id.</u> at 11, 123 A. at 573, an employee was injured and awarded worker's compensation, which the employer was obligated to pay. The relevant worker's compensation statute defined the word "employer" as "a person . . . employing workmen in extrahazardous employments." <u>Id.</u> at 12, 123 A. at 573 (emphasis omitted). The employer, who had only the one employee, contended that the worker's compensation statute did not apply because the phrase "a person . . . employing workmen" did not include a person who employed only one workman. <u>See id.</u> at 12, 123 A. at 573. This Court rejected the employer's contention, stating: "This question . . . is . . . fully answered by" Art. I, § 7. <u>Id.</u> at 12, 123 A. at 573.

- 14 -

Although <u>Gatewood</u> and <u>Wheeler</u> involved GP § 1-202's predecessors—which were not completely identical to GP § 1-202—<u>Gatewood</u> and <u>Wheeler</u> are controlling with respect to GP § 1-202's application, as GP § 1-202 is substantively identical to its predecessors. Both of GP § 1-202's predecessors, Art. I, §§ 7 and 8, stated: "The singular always includes the plural, and vice versa, except where such construction would be unreasonable." In 2014, the General Assembly recodified Art. I, § 8 as GP § 1-202, which states: "The singular includes the plural and the plural includes the singular." <u>See</u> 2014 Md. Laws 407, 423-24 (Vol. I, Ch. 94, H.B. 270). In other words, in 2014, the General Assembly made only three changes: deleting the word "always," replacing the phrase "vice versa" with the phrase "the plural includes the singular," and deleting the phrase "except where such construction would be unreasonable."

None of these three changes was substantive, however. The Revisor's Note to GP § 1-202 states in its entirety:

> [GP § 1-202] is new language derived **without substantive change** from former Art. 1, § 8. The phrase "the plural includes the singular" is substituted for the former phrase "vice versa" for clarity. The former phrase "except where such construction would be unreasonable" is deleted as a standard rule of statutory construction. *See* General Revisor's Note to title.

(Emphasis added) (paragraph breaks omitted). <u>See also</u> 2014 Md. Laws 424 (Vol. I, Ch. 94, H.B. 270). In turn, the General Revisor's Note to Title 1 (Rules of Interpretation) of the General Provisions Article states, in pertinent part:

> Throughout this subtitle,[14] former language indicating that a definition

---

[14]It is evident that "this subtitle" was supposed to read "this title." For one thing, "this subtitle" appears in a revisor's note to a title, not in a revisor's note to a subtitle. For

- 15 -

applies unless such a construction would be "unreasonable" is deleted. The General Provisions Article Review Committee believes such a caveat is **unnecessary** because Maryland case law already factors the unreasonableness of a particular construction into a determination of legislative intent. *See Board of Trustees v. Hughes*, 340 Md. 1, 7[, 664 A.2d 1250, 1253] (1995) ("[W]e seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." [(Citation omitted)]); *Wagner v. Board of County Commissioners*, 263 Md. 560, 568[, 284 A.2d 5, 9] (1971) ("[W]e should prefer a construction which leads to a reasonable, rather than an unreasonable and absurd[,] result."); [] *Doswell v. State*, 53 Md. App. 647, 653[, 455 A.2d 995, 999] (1983) ("[T]he statute should be read in a commonsense manner to avoid an unreasonable or absurd result." [(Citation omitted)]). **No substantive change is intended.**

(Emphasis added) (some alterations in original). See also 2014 Md. Laws 436 (Vol. I, Ch. 94, H.B. 270).

In short, the General Assembly's express purpose in deleting the phrase "except where such construction would be unreasonable" was simply to ensure that GP § 1-202 did not include any "unnecessary" language. Likewise, the General Assembly did not substantively change GP § 1-202's predecessors by deleting the word "always" when enacting GP § 1-202. There is no difference between "The singular always includes the plural" and "The singular includes the plural." Finally, the General Assembly did not substantively change GP § 1-202's predecessors by replacing the phrase "vice versa" with "the plural includes the singular" when enacting GP § 1-202. According to the Revisor's

---

another thing, the statements about the word "unreasonable" in the paragraph in which "this subtitle" appears apply to statutes in more than one subtitle. For example, the statements apply to GP § 1-202, which is part of Subtitle 2, and whose predecessors included the phrase "except where such construction would be unreasonable"; and, the statements also apply to GP § 1-107 ("'County' means a county of the State or Baltimore City."), which is part of Subtitle 1, and whose predecessor stated: "[T]he word 'county' shall be construed to include the city of Baltimore, unless such construction would be unreasonable."

Note to GP § 1-202, the change was simply "for clarity."

As demonstrated above, GP § 1-202 is substantively identical to its predecessors, and Gatewood and Wheeler endure as good law with respect to GP § 1-202's application. The lesson of GP § 1-202, Gatewood, and Wheeler is that a singular word in a statute is not necessarily limited to only one subject, and a plural word in a statute is not necessarily limited to multiple subjects. Just as the word "time" meant "time or times" in the statute that was at issue in Gatewood, 244 Md. at 618, 224 A.2d at 683 (citation and internal quotation marks omitted), the word "test" means "test or tests" in TR § 16-205.1(b)(2) and (3). The "question . . . is . . . fully answered by" GP § 1-202, Wheeler, 144 Md. at 12, 123 A. at 573; applying GP § 1-202 conclusively demonstrates that, as used in TR § 16-205.1(b)(2) and (3), the word "test" includes both an alcohol concentration test and a drug test.

Because TR § 16-205.1(a)(1)(iii)(3)'s plain language and GP § 1-202's application alone establish that, as used in TR § 16-205.1(b)(2) and (3), the word "test" may properly be taken as meaning "tests"—i.e., both an alcohol concentration test and a drug test—we could end our inquiry into TR § 16-205.1's interpretation without further discussion. Nonetheless, "even when we believe that the language of [a] statute renders [the General Assembly's] intent clear, [we may] examine the legislative history as a confirmatory process." Gomez v. Jackson Hewitt, Inc., 427 Md. 128, 160, 46 A.3d 443, 462 (2012) (citation omitted). Accordingly, we examine TR § 16-205.1's legislative history. In doing so, we find even greater support for our conclusion.

The predecessor of TR § 16-205.1 that was effective in 1988, Md. Code Ann.,

Transp. (1987 Repl. Vol., 1988 Supp.) § 16-205.1, did not define the word "test," as TR § 16-205.1(a)(1)(iii) does. Notably, TR § 16-205.1's predecessor did not provide for drug testing, as TR § 16-205.1 does, and did not direct law enforcement officers to confiscate a driver's license and serve an order of suspension on the MVA's behalf upon a refusal to take a test, as TR § 16-205.1(b)(3)(i) does.

In 1988, the General Assembly established a Task Force on Drunk and Drugged Driving ("the Task Force") because "[d]runk and drugged drivers kill[ed] and injure[d] many people on the highways every year[,] and . . . [t]he problem of drunk and drugged driving [wa]s of continuing concern to the citizens of the State of Maryland[.]" 1988 Md. Laws 5123 (Joint Resolution No. 15, House Joint Resolution No. 53) (paragraph break omitted). The General Assembly charged the Task Force with the following duties, among others:

> (1) Examining methods of increasing the effectiveness of the remedies currently available for combatting drunk and drugged driving; (2) Examining remedies developed by other states and jurisdictions to deal with the problem of drunk and drugged drivers; [and] (3) Recommending changes and additions to current laws and regulations dealing with drunk and drugged drivers[.]

1988 Md. Laws 5124 (paragraph breaks omitted). In 1988, in an interim report,

> the Task Force recommended that the General Assembly enact what it referred to as an ["]administrative per se law[,"] which would provide "for the prompt suspension of the driver's license of an individual who, upon being detained by a [law enforcement] officer on suspicion of driving or attempting to drive while under the influence of alcohol or while intoxicated, either: 1) Refused to take a [blood alcohol concentration] test; or 2) Submitted to the [blood alcohol concentration] test, and the results exceeded a statutorily defined limit."

Motor Vehicle Admin. v. Shrader, 324 Md. 454, 460, 597 A.2d 939, 942 (1991) (quoting

Task Force on Drunk and Drugged Driving, Interim Report to the General Assembly, at 6 (1988)) (fourth alteration in original).

In response, in 1989, the General Assembly passed House Bill 556 and amended Md. Code Ann., Transp. (1987 Repl. Vol., 1988 Supp.) § 16-205.1 to, among other things, direct law enforcement officers to confiscate a driver's license and serve an order of suspension on the MVA's behalf upon a refusal to take an alcohol concentration test. See 1989 Md. Laws 2331, 2332, 2337 (Vol. IV, Ch. 284, H.B. 556).

Significantly, a prior version of House Bill 556, before its enactment, included references to drug testing. See 1989 Md. Laws 2334, 2336, 2337, 2338, 2340, 2342. Under a previous version of House Bill 556, the General Assembly would have amended Md. Code Ann., Transp. (1987 Repl. Vol., 1988 Supp.) § 16-205.1(b)(2) to state, in pertinent part:

> [I]f a [law enforcement] officer stops or detains any person who the [law enforcement] officer has reasonable grounds to believe is or has been driving or attempting to drive a motor vehicle while intoxicated, while under the influence of alcohol, **while under the influence of drugs or drugs and alcohol, while under the influence of a controlled dangerous substance**, or in violation of an alcohol restriction, and who is not unconscious or otherwise incapable of refusing to take **a test for alcohol or drugs or both**, the [law enforcement] officer shall[, among other things]: (i) Detain the person; [and] (ii) Request that the person permit **a test or tests** to be taken of the person's blood or breath, urine, or other body fluids to determine the alcohol concentration or drug content of the person's body[.]

1989 Md. Laws 2336 (emphasis added) (strikethroughs and words in brackets omitted).

According to a "Summary of Amendments by Del. Horne" (bolding and some capitalization omitted), the General Assembly struck from House Bill 556 the "provisions providing for drug testing" because "[n]o entity [was] set up to handle [drug testing as of

- 19 -

the] 1-1-90 effective date[.]" In other words, in 1989, the General Assembly refrained from amending Md. Code Ann., Transp. (1987 Repl. Vol., 1988 Supp.) § 16-205.1 to provide for drug testing because preparations could not be completed before the date on which the amendment would become effective.

It was not long, however, before the General Assembly amended Md. Code Ann., Transp. § 16-205.1 to provide for drug testing. In 1989, in an interim report, the Task Force noted that "both arrests and convictions for drugged driving offenses . . . [we]re underrepresented when compared to arrests and convictions for drunk driving offenses." In response, in 1990, the General Assembly amended Md. Code Ann., Transp. (1987 Repl. Vol., 1989 Supp.) § 16-205.1 to, among other things, add a definition of the word "test" in Md. Code Ann., Transp. § 16-205.1(a)(1)(iii) that included a blood test for drugs, stating:

> "Test" means: 1. A test of a person's breath or of [one] specimen of a person's blood to determine alcohol concentration; 2. A test or tests of [one] specimen of a person's blood to determine the drug or controlled dangerous substance content of the person's blood; or 3. Both: A. A test of a person's breath or a test of [one] specimen of a person's blood, to determine alcohol concentration; and B. A test or tests of [one] specimen of a person's blood to determine the drug or controlled dangerous substance content of the person's blood.

1990 Md. Laws 1706, 1707, 1715 (Vol. III, Ch. 413, H.B. 492) (paragraph breaks omitted). Accordingly, the General Assembly amended multiple other parts of Md. Code Ann., Transp. (1987 Repl. Vol., 1989 Supp.) § 16-205.1 to refer to "a test" without specifying an alcohol concentration test or a drug test. Significantly, the General Assembly amended Md. Code Ann., Transp. (1987 Repl. Vol., 1989 Supp.) § 16-205.1(b)(2)(ii) to remove the phrase "of the person's blood or breath to determine alcohol concentration" after the phrase

- 20 -

"Request that the person permit a test to be taken[.]" 1990 Md. Laws 1717.

In amending Md. Code Ann., Transp. (1987 Repl. Vol., 1989 Supp.) § 16-205.1—in particular, in defining the word "test" to include "[b]oth" an alcohol concentration test and a drug test—the General Assembly made clear that the word "test" was intended to include both tests. TR § 16-205.1's legislative history makes evident that the statute was amended over time to include testing for drugs as well as alcohol, and that its purpose is to protect the public by deterring **both** drunk driving **and** drugged driving. See Janes v. State, 350 Md. 284, 288, 287, 711 A.2d 1319, 1321, 1320 (1998) (This Court referred to one of TR § 16-205.1's predecessors as one of the "statutes bearing on Maryland's effort to keep drunk **and drugged** drivers off the State's roads[.]" (Emphasis added)). This makes perfect sense, as any impaired driver is dangerous, regardless of whether the driver is impaired because of alcohol, drugs, or both. It would be both illogical and inconsistent with TR § 16-205.1's legislative history and purpose to conclude that a law enforcement officer must choose whether to request an alcohol concentration test or a drug test—*i.e.*, that a law enforcement officer cannot request both an alcohol concentration test and a drug test to protect the public from an apparently impaired driver.

Contrary to the plain language and legislative history of the statute, Gonce contends that TR § 16-205.1 authorizes multiple tests only where a person is involved in a motor vehicle accident that results in death or a life-threatening injury. In arguing that, as used in TR § 16-205.1(b)(2) and (3), the word "test" means only one test, Gonce notes that TR § 16-205.1(a)(1)(iii) provides:

"Test" means, **unless the context requires otherwise** . . . [b]oth: A. A test

- 21 -

of a person's breath or a test of [one] specimen of a person's blood, to determine alcohol concentration; and B. A test or tests of [one] specimen of a person's blood to determine the drug or controlled dangerous substance content of the person's blood.

(Emphasis added) (paragraph breaks omitted).  Gonce points out that TR § 16-205.1(c)(1) states:

> If a person is involved in a motor vehicle accident that results in the death of, or a life[-]threatening injury to, another person and the person is detained by a [law enforcement] officer who has reasonable grounds to believe that the person has been driving or attempting to drive while under the influence of alcohol, while impaired by alcohol, while so far impaired by any drug, any combination of drugs, or a combination of one or more drugs and alcohol that the person could not drive a vehicle safely, while impaired by a controlled dangerous substance, or in violation of [TR] § 16-813 [(Driving Commercial Motor Vehicle with Alcohol Concentration in Blood or Breath Prohibited)], the person shall be required to submit, as directed by the [law enforcement] officer, to **a test of: (i) The person's breath to determine alcohol concentration; (ii) One specimen of the person's blood, to determine alcohol concentration or to determine the drug or controlled dangerous substance content of the person's blood; or (iii) Both the person's breath under item (i) of this paragraph and one specimen of the person's blood under item (ii) of this paragraph.**

(Emphasis added) (paragraph breaks omitted).  Gonce, therefore, contends that TR § 16-205.1(a)(1)'s use of the phrase "unless the context requires otherwise" and TR § 16-205.1(c)(1)'s reference to multiple tests establish that the word "test" means both an alcohol concentration test and a drug test only where TR § 16-205.1(c)(1) is implicated— *i.e.*, only where "a person is involved in a motor vehicle accident that results in the death of, or a life[-]threatening injury to, another person[.]"

Gonce is mistaken.  TR § 16-205.1(a)(1)(iii)'s use of the phrase "unless the context requires otherwise" and TR § 16-205.1(c)(1)'s reference to multiple tests do not result in the interpretation that Gonce urges.  The word "test" means both an alcohol concentration

test and a drug test where, as here, TR § 16-205.1(b)(2) and (3) are implicated—*i.e.*, where no person is involved in a motor vehicle accident that results in the death of, or a life-threatening injury to, another person.  We explain.

Although we would normally begin with a plain language analysis of the two sections, the legislative history definitively demonstrates the General Assembly's intent that TR § 16-205.1(c)(1) and TR § 16-205.1(a)(1) independently authorize multiple tests.  A review of TR § 16-205.1's legislative history reveals that Md. Code Ann., Transp. (2002 Repl. Vol., 2003 Supp.) § 16-205.1(a)(1)'s definition of the word "test"[15] lacked the phrase "unless the context requires otherwise."  Without referring to multiple tests, Md. Code Ann., Transp. (2002 Repl. Vol., 2003 Supp.) § 16-205.1(c)(1) stated that, under certain circumstances, a "person [was] required to submit to a test, as directed by [a law enforcement] officer."

In 2004, by passing Senate Bill 592, the General Assembly amended Md. Code Ann., Transp. (2002 Repl. Vol., 2003 Supp.) § 16-205.1(a)(1)'s definition of the word "test" to add the phrase "unless the context requires otherwise" after the phrase "'Test means'"; the definition still provided for multiple tests.  See 2004 Md. Laws. 2189, 2190, 2191 (Vol. III, Ch. 468, S.B. 592).  Notably, in passing Senate Bill 592, the General Assembly also amended Md. Code Ann., Transp. (2002 Repl. Vol., 2003 Supp.) § 16-

---

[15]At that time, the definition of the word "test" was in TR § 16-205.1(a)(1)(iv), where it had been since 2001.  See 2001 Md. Laws 28, 29, 38 (Vol. I, Ch. 5, H.B. 3).  In 2013, the General Assembly amended Md. Code Ann., Transp. (2012 Repl. Vol.) § 16-205.1(a)(1) to move the definition of the word "test" back to TR § 16-205.1(a)(1)(iii), where it remains.  See 2013 Md. Laws 200, 205, 243-44 (Vol. I, Ch. 43, S.B. 284).

205.1(c)(1) so that it read as TR § 16-205.1(c)(1) reads—*i.e.*, so that it referred to multiple tests. See 2004 Md. Laws 2190, 2191-92.

By adding to TR § 16-205.1(a)(1) the phrase "unless the context requires otherwise" at the same time that it added TR § 16-205.1(c)(1)'s reference to multiple tests, the General Assembly indicated an intent that TR § 16-205.1(a)(1)'s definition of multiple tests applied unless TR § 16-205.1(c)(1) applied or was implicated—*i.e.*, that the context required otherwise.[16]  A key difference in the application of TR § 16-205.1(a)(1)(iii)'s definition of multiple tests and TR §  16-205.1(c)(1)'s reference to multiple tests is whether a person is required to submit to the tests (TR § 16-205.1(c)(1)) or a person may be requested to take the tests (TR § 16-205.1(b)(2)).  Under TR § 16-205.1(c)(1), a person shall be required to submit to multiple tests, whereas, under TR § 16-205.1(b)(2), a law enforcement officer may only **request** that a person submit to multiple tests.  TR § 16-205.1(c)(1) provides, in pertinent part:

> If a person is involved in a motor vehicle accident that results in the death of, or a life[-]threatening injury to, another person[,] and the person is detained by a [law enforcement] officer . . **. the person shall be required to submit**, as directed by the [law enforcement] officer, to a test of: (i) The person's breath to determine alcohol concentration; (ii) One specimen of the person's blood, to determine alcohol concentration or to determine the drug or controlled dangerous substance content of the person's blood; or (iii) Both the person's breath under item (i) of this paragraph and one specimen of the person's blood under item (ii) of this paragraph.

---

[16]Although worded only slightly differently, the multiple tests to which the amended version of TR § 16-205.1(c)(1) referred are not identical to the definition of the word "test" as used in TR § 16-205.1(a)(1)(iii).  The amended version of TR § 16-205.1(c)(1) referred to a **breath** alcohol concentration test, a drug test, or both.   TR § 16-205.1(a)(1) defined the word "test" as an alcohol concentration test (**whether through breath or blood**), a drug test, or both.

(Emphasis added). In contrast, TR § 16-205.1(b)(2) provides, in pertinent part:

> Except as provided in [TR § 16-205.1(c)], if a [law enforcement] officer stops or detains any person who the [law enforcement] officer has reasonable grounds to believe is or has been driving or attempting to drive a motor vehicle while under the influence of alcohol, while impaired by alcohol, while so far impaired by any drug, any combination of drugs, or a combination of one or more drugs and alcohol . . . and who is not unconscious or otherwise incapable of refusing to take a test, the [law enforcement] officer shall[, among other things]: (i) Detain the person; [and] (ii) **Request that the person permit a test to be taken[.]**

(Emphasis added). As explained above, at the same time that the General Assembly amended TR § 16-205.1(a)(1) to add the phrase "unless the context requires otherwise" after the phrase "'Test' means[,]" the General Assembly amended TR § 16-205.1(c) to refer to multiple tests. The legislative history of the statute is in accord with the plain language. Under the plain language of the statute, the phrase "unless the context requires otherwise" in the amended version of TR § 16-205.1(a)(1) simply pertains to the amended version of TR § 16-205.1(c)(1)'s reference to multiple tests being required, as opposed to TR § 16-205.1(a)(1)'s definition of multiple tests that can be requested under TR § 16-205.1(b)(2). The legislative history setting forth the simultaneous nature of the amendments to TR § 16-205.1(a)(1) and TR § 16-205.1(c)(1) decisively establishes this conclusion. As such, the phrase "unless the context requires otherwise" in TR § 16-205.1(a)(1)(iii) does not affect our conclusion that the word "test" may be taken to mean both an alcohol concentration test and a drug test where, as here, TR § 16-205.1(b)(2) and (3) are implicated.

Gonce fails to heed the rules of statutory interpretation in contending that the word "test" means both an alcohol concentration test and a drug test only where TR § 16-

205.1(c)(1) is implicated. Under Gonce's interpretation, TR § 16-205.1(a)(1)(iii)(3)'s definition of the word "test" as both an alcohol concentration test and a drug test would be meaningless because the definition would not apply to any part of TR § 16-205.1—not even TR § 16-205.1(c)(1), which independently provides for multiple tests. Gonce's interpretation is inconsistent with the rule that, "[w]henever possible, a statute should be read so that no word, clause, sentence or phrase is rendered . . . nugatory." Lark, 414 Md. at 224, 994 A.2d at 973 (citation and internal quotation marks omitted).

As a final matter, we dispose of Gonce's contention that, assuming that we agree with the MVA (as we do), our interpretation of TR § 16-205.1(b)(2) and (3) is unconstitutional—*i.e.,* inconsistent with the Fourth Amendment to the United States Constitution (Search and Seizure) and Article 26 of the Maryland Declaration of Rights (Warrants for Search and Seizure).[17] The constitutional issues that Gonce raises are not before us for several reasons. Significantly, the issues were neither raised before nor decided by the ALJ. See Brodie v. Motor Vehicle Admin. of Md., 367 Md. 1, 3-4, 785 A.2d 747, 749 (2001) ("[I]n an action for judicial review of an adjudicatory decision by an administrative agency, a reviewing court ordinarily may not pass upon issues presented to it for the first time on judicial review and that are not encompassed in the final decision of the administrative agency. Stated differently, a court will review an adjudicatory agency decision solely on the grounds relied upon by the [administrative] agency." (Citation,

---

[17]In his brief, Gonce referred to Article 4 of the Maryland Declaration of Rights ("That the People of this State have the sole and exclusive right of regulating the internal government and police thereof, as a free, sovereign and independent State."). Presumably, Gonce meant to refer to Article 26 of the Maryland Declaration of Rights.

ellipsis, paragraph break, and internal quotation marks omitted)). The issues were neither raised in nor decided even by the circuit court. Further, the MVA did not raise the issues in the petition for a writ of *certiorari*, and Gonce did not cross-petition for a writ of *certiorari*.

The sole issue before this Court is TR § 16-205.1's interpretation. In his brief, Gonce simply alleges constitutional violations without making any particularized argument whatsoever. See Anne Arundel Cnty. v. Harwood Civic Ass'n, Inc., 442 Md. 595, 614, 113 A.3d 672, 684 (2015) ("Arguments . . . not presented with particularity will not be considered[.]" (Brackets, citation, and internal quotation marks omitted). In any event, this Court will not decide constitutional issues unnecessarily. See, e.g., VNA Hospice of Md. v. Dep't of Health and Mental Hygiene, 406 Md. 584, 606, 961 A.2d 557, 570 (2008) ("[T]his Court will avoid deciding the constitutional issues and decide the case on a non-constitutional ground if reasonably possible."); Prof' Staff Nurses Ass'n v. Dimensions Health Corp., 346 Md. 132, 138, 695 A.2d 158, 161 (1997) ("This Court has regularly adhered to the principle that we will not reach a constitutional issue when a case can properly be disposed of on a non-constitutional ground." (Citation, brackets, and internal quotation marks omitted)).

To the extent that Gonce contends that TR § 16-205.1's authorization of multiple tests "pierce[s]" his rights, such a contention ignores the purpose of the statute. TR § 16-205.1's purpose is not to provide procedural protections to drivers who are suspected to be impaired by alcohol, drugs, or both; instead, TR § 16-205.1's purpose is to protect the public by deterring drunk and/or drugged driving. See Janes, 350 Md. at 288, 287, 711

A.2d at 1321, 1320 (This Court referred to one of TR § 16-205.1's predecessors as one of the "statutes bearing on Maryland's effort to keep drunk and drugged drivers off the State's roads[.]"); <u>Najafi v. Motor Vehicle Admin.</u>, 418 Md. 164, 181, 12 A.3d 1255, 1266 (2011) (TR 16-205.1's "purpose . . . [i]s to protect the public rather than the accused[.]" (Citation omitted)). In sum, the need to fulfill TR § 16-205.1's purpose to protect the public and honor its plain language leads us to conclude that, under TR § 16-205.1(b)(2) and (3), a driver is subject to an automatic license suspension for a refusal to take a drug test where the driver has taken an alcohol concentration test and a law enforcement officer has reasonable grounds to believe that the driver was driving while impaired by drugs or a combination of drugs and alcohol.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED. CASE REMANDED WITH INSTRUCTIONS TO AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE. RESPONDENT TO PAY COSTS.**